MARYLAND CASUALTY COMPANY

*v.*

MYRTLE A. MILLER.

358 S.W.2d 316.

(*Knoxville,* September Term, 1961.)

(May Session, 1962.)

Opinion filed June 5, 1962.

M. LACY WEST, Kingsport, for petitioner.

WILSON, WORLEY & GAMBLE, Kingsport, for respondent.

MR. JUSTICE BURNETT delivered the opinion of the Court.

This is a workmen's compensation case in which the Chancellor found in favor of the employee and awarded total and permanent compensation. An appeal has been seasonably perfected, able arguments heard and briefs filed. After considering these briefs, the record, giving the matter considerable thought and some independent investigation, we are now in a position to decide the issues.

In essence there is really only one question presented, that is, whether or not there was material evidence upon which the Chancellor concluded that the total permanent disability of the petitioner, which was diagnosed as panniculitis and dermatomycositis, is so closely related to conceded compensable dermatitis as to make it compensable. The very able argument is made that, since causes of these diseases are unknown, the arriving at the conclusion that they were the result of dematitis is purely theory, speculation and conjecture.

The facts show that on June 2, 1958, Mrs. Miller, a woman sixty-three (63) years of age, while at work on the premises of her employer in helping another employee install an acoustical tile on the ceiling of the premises, certain quantities of dust and other substance or material

from this tile fell on her head, face, shoulders, arms and other exposed portions of her body, causing these portions of her body to become irritated and swollen resulting in contact dermatitis. It is conceded that Mrs. Miller is now totally and permanently disabled by conditions known as panniculitis and dermatomycositis.

Panniculitis is a condition which involves the breaking out of the fatty tissues of the body, and possibly also the nerve tissues. Dermatomycositis involves inflammation and destruction of the muscle tissues of the body. Both are rare conditions, for which no cure is known.

The compensation carrier voluntarily paid Mrs. Miller temporary total disability for a period of sixty-two (62) weeks, until October 4, 1959, when payments of such benefit were terminated. Thus after the termination of these benefits this suit was instituted.

It was the claim of Mrs. Miller that the original contact dermatitis, about which there is no question, progressed into the present disabling condition, and that these conditions are so closely related to the original contact dermatitis as to be compensable. The insurance carrier takes the position that there is insufficient proof to relate the present disabled condition with the initial contact dermatitis, and that the simultaneous development and existence of these conditions were purely coincidental.

The trial court found that her present condition was traceable to and very closely related to her admittedly compensable contact dermatitis. The record supports such a finding. At the time this dust first fell upon Mrs. Miller, and up until that time, her health had been excellent and she was a normal person. After this dust had fallen on her the exposed portions of her body, which

were touched by this dust, immediately commenced itching and burning and soon became red. From the very beginning this condition was limited to the exposed portion of her body and very closely followed the pattern of the dress which the woman was wearing at the time the dust fell upon her.

This original condition of itching, etc., soon progressed to open weeping lesions, still confined to the portions of her body exposed to the dust, and shortly after it broke out this was diagnosed as contact dermatitis resulting from the falling of this dust upon Mrs. Miller. Dermatitis is a compensable occupational disease, sec. 50-1101, T.C.A.

Some weeks after this dermatitis had been going on Mrs. Miller commenced to have weakness of her arms, in addition to the continued manifestations of dermatitis and about a month after this dust had fallen upon her she was taken to a hospital for examination and treatment. Her local doctor apparently was unable to devise effective means of treating this dermatitis or to make a diagnosis which would account for the weakness of her arms. As a result of this she was sent to the University of Virginia Hospital where she was treated and hospitalized.

All the time this was going on this woman continued to remain about the same with a lot of eruptions in the area affected by the dermatitis, and the muscular weakness of her arms increased. She developed tender nodules or lumps under the skin of the exposed portions of her body. After she was released from the University of Virginia Hospital she continued to have the same dermatitis and progressive weakness of the muscles of her arms. She was again taken back to the University Hospital for fur-

ther tests and examinations, at which time it was concluded that she was suffering from panniculitis and possibly also from dermatomycositis.

The record shows without dispute that this woman had none of these symptoms or trouble prior to this. She had never had lumps under her skin, or muscle weakness, in any area, and she doesn't have any in any area now other than that which was on the exposed portions of her body that were affected by the original dust falling thereon.

Her local doctor, Dr. Bolling, became very much interested in this case and made quite an extensive study of it and followed her condition very closely, seeing her upwards of fifty times in the space of three months. He testified, and was of the very positive opinion, that this woman's disabling condition resulted from the contact dermatitis, which she had received as the result of this dust falling on her.

Among other things he was asked the question whether or not this disabling condition was the result of the contact dermatitis, which was due to this dust falling on her, and he very positively said that he was of this opinion. He said: "I think she had her dermatitis from this irritant of acoustic tile dust and instead of clearing up like ordinary contact dermatitis will do, she didn't respond to any treatment. I think this continued on into this panniculitis disease syndrome." He says further that due to his observation, "That is the cause in this particular case. That is the only case I've ever seen. I'll put that in, too."

This same Dr. Bolling, of course, testified that what he was testifying was of his own knowledge and what he thought from his study of it, but it was bound to be theoretical, but that it was his theory and his unquestioned

opinion. The very eminent specialist from the University of Virginia was not so certain; he didn't know anything about it and was more or less inclined to be of the opinion that the contact dermatitis didn't cause her present condition, but he did not deny that there was respectable medical authority that her present condition might have been caused from this foreign substance, and might have contributed to her disabling condition.

A very noted internist of Knoxville examined this woman twice and was of the opinion that this contact dermatitis did not cause her disabling condition, but he likewise admitted that there was medical opinion to the effect that this disabling condition might result from an allergic reaction.

The trial judge, after hearing all this proof of the connections and the fact that this condition merely appeared on the arms and the parts of the body where this dust had fallen and following on through to the fact that she never had any of these symptoms before and then on Dr. Bolling's testimony of his opinion from his very constant and thorough study of the matter of the woman, concluded that her present disabled condition was due to this compensable contact dermatitis.

This conclusion, of course, by the Chancellor was based upon controversial issues, but his finding was supported by very material evidence, and is conclusive upon this Court.

When there is medical testimony, it need not necessarily establish positively the nature and etiology of a disease. For example this Court affirmed an award based on the theory that a strain, accompanied by a sharp pain at the base of the neck, and followed by continuous pain,

caused or accelerated a cancer that later led to the workman's death. In this case the doctors all admitted that the cause of cancer was not known. Two of the doctors testified that the strain probably aggravated the cancer and that was enough to support the award. *Boyd v. Young,* 193 Tenn. 272, 246 S.W.2d 10. We cite this case because it was the sequence of events that was convincing. The argument there made was as here that any conclusion is "pure conjecture".

In the present case, as said above, we have an uncontradicted sequence of events, and when the finder of facts has such a sequence of events this presents an issue of fact to be determined by the finder of facts as to the part this sequence of events plays in the resulting disability. In a number of compensation cases from other states even though the medical testimony was to the effect that it would be pure speculation to attribute an injury as due to a certain cause, the award was upheld by courts of last resort on the strength of a sequence of facts pointing to industrial causation. See Larson's Workmen's Compensation, Vol. 2, sec. 79.52, et seq. We though in this case do not have to go so far because here the judgment of a doctor is that these things did cause her disabled condition.

An interesting comment, which applies to the medical testimony in this case, and is likewise in Larson, supra, sec. 80.32, is:

"It is a common experience of compensation and personal injury lawyers to find that the more distinguished the medical witness is, the more tentative and qualified are his statements on the witness stand."

In other words we cite this fact to illuminate the point that in medical science there can be really in many instances no degree of scientific exactness so that the doctor the greater his experience would say either "yea" or "nay". That is really what has happened herein. Of course, it is recognized that medical science is not an exact science and that that profession though it has had the greatest advance probably of any profession has not given a name to every human ailment.

■ The questions involved herein as to whether or no this contact dermatitis caused these disabling diseases can be reasoned very much as was reasoned by the Court in *Whitehead v. Holston Defense Corp.*, 205 Tenn. 326, 326 S.W.2d 482. In that case, this Court held that the section covering occupational diseases, sec. 50-1101, T.C.A., does not require that the disease from which the employee suffers be proved to that degree of scientific exactness as to classify it as one of the listed occupational diseases, and also we held therein that diseases closely related to the classified diseases in causative effect must be classified as "occupational" provided the elements of causation can be connected directly or indirectly with the conditions under which the employee was required to work. We in this case, and others therein cited, have placed a very broad interpretation upon sec. 50-1101, T.C.A., which is apparently calculated to offset in some measure the unusually short scheduled list. Reason, justice and common sense demand that it be so enlarged when it is shown that the end result came from the listed disease.

■ Where there is conflict in medical testimony it is our duty to resolve this in favor of the employee rather

than against her. *Milstead v. Kaylor,* 186 Tenn. 642, 212 S.W.2d 610. It is hard for us to see how a court, a trier of facts, could arrive at any other conclusion than that arrived at herein in view of the testimony of Dr. Bolling, wherein many times he emphasized the fact that he thought the present disabling conditions were due to this compensable occupational disease of contact dermatitis. Probably the most glaring statement he made to this effect was when on cross-examination he was being asked whether or not this condition might not have arisen irrespective of the dust, and he said that was a far off possibility. "But seeing the patient, following her all this period of time, it is certainly related right back to this dust that got on the exposed part of her body and it has been a continuous thing ever since." The trial judge believed this and we do not think that the normal elements of speculation and conjecture are herein to such an extent that it could be said that this woman's present disabled condition is not what her own doctor said about it and due to this a compensable occupational disease.

From what has been said herein it is obvious that we think that the Chancellor was eminently correct, and thus it is that his judgment must be affirmed.