The NEW JERSEY ZINC COMPANY,
Appellant,

v.

Estle J. COLE, Appellee.

Supreme Court of Tennessee.

Dec. 22, 1975.

O. D. Bridges, Catlett, Ramsey & Bridges, Jefferson City, for appellant.

William P. Newkirk, Egerton, McAfee, Armistead, Davis & McCord, P. C., Knoxville, for appellee.

## OPINION

FONES, Chief Justice.

Plaintiff Cole was awarded workmen's compensation benefits for a "closely related" occupational disease and defendant, New Jersey Zinc Company, his employer, appeals.

Defendant has assigned seven (7) errors, and the principal issue raised is whether the medical proof is sufficient to establish that plaintiff suffers from an occupational disease closely related to those named in T.C.A. § 50–1101 and having its origin and cause in a risk connected with his employment by defendant.

### I.

Plaintiff worked for defendant for more than sixteen (16) years, beginning in April, 1956, and ending August 30, 1972. His duties involved mine maintenance and construction, and most of his work was performed underground.

On direct examination plaintiff related his work career as beginning in 1939 with American Zinc Company as an underground worker. The substance of his direct testimony was that he worked in various mines in the Mascot-Jefferson City area operated by American Zinc Company and TCI, apparently a subsidiary of U.S. Steel, from 1939 to 1956, with the exception of less than a year when he farmed and performed odd jobs.

When plaintiff was cross-examined at the trial, counsel for defendant, armed with specific details of plaintiff's entire employment career was able to show that plaintiff had worked at jobs other than zinc mining for four (4) years and nine (9) months during the period 1939 to 1956.

Plaintiff testified that the air in defendant's zinc mine was heavily laden with dust, powder, diesel fumes and other injurious substances. Several employees gave similar descriptions of conditions in defendant's mine and one described the intensity of the black dust and smoke much more vividly than plaintiff.

At the close of plaintiff's proof, defendant moved to dismiss. The trial judge overruled the motion and defendant offered no proof. Thus, no countervailing evidence was adduced either lay or medical.

## II.

Plaintiff testified that defendant required that he be examined by Dr. Milligan, defendant's doctor, prior to his employment in 1956, which examination included x-rays of his chest.

In January, 1972, plaintiff became ill and his wife took him to the emergency room at Ft. Sanders Hospital where he was placed under the care of Dr. Domm, a thoracic surgeon. Plaintiff's illness was diagnosed as pneumonia but after a short period of hospitalization he returned to work. However, he was seen a number of times by Dr. Domm and on April 27, 1972, special x-ray studies with iodized oil drops were conducted and considerable distortion was found in the left lung, of undetermined cause.

In August, 1972, plaintiff had shortness of breath, pains in his chest and coughing and was sent to Dr. Milligan by defendant's supervisor. Dr. Milligan obtained an appointment for him with Dr. Domm and he was promptly hospitalized and has not worked a day since August 30, 1972.

From August, 1972, through January, 1974, plaintiff was continuously under the care, treatment, and direction of Dr. Domm. He was hospitalized a number of times and referred to other doctors for various tests and on occasion, treatment for temporary maladies. Throughout the period of Dr. Domm's care, plaintiff's principal complaint was shortness of breath. In September, 1972, plaintiff was hospitalized for acute bronchitis, which responded to simple treatment, but Dr. Domm "continued to worry" about his left side and observed some density on the right side, apparently from x-ray studies.

In November, 1972, plaintiff developed knots on his right arm and lost the use of his right hand. This alarmed Dr. Domm and plaintiff was again hospitalized. A neurologist and an internist were called in as consultants. Pulmonary function studies were performed with remarkably alarming results. His breathing at that time was described as severely restricted with obstructive impairment.

Dr. Domm thought possibly plaintiff had some rare condition and sent him to Dr. McCampbell who biopsied two masses without significant results. In January, 1973, while Dr. Domm was continuing to check plaintiff, a right leg limp developed and plaintiff was referred to the neurologist who again failed to report any significant findings involving the central nervous system. In May, 1973, Dr. Domm hospitalized plaintiff again principally because of a new symptom, difficulty in swallowing. X-rays and swallowing studies were performed without significant result. Later in May, plaintiff was readmitted to St. Mary's Hospital for what appeared to be a respiratory infection. A lung scan was performed and reported normal, apparently ruling out arterial disease. Breathing tests again showed poor ventilation.

Finally, on August 14, 1973, Dr. Domm performed a biopsy of plaintiff's lung. We quote from Dr. Domm's testimony, concerning the biopsy report and his diagnosis:

"A. That official report by Dr. Carter Miller, a pathologist, states 'interstitial fibrosis, nodular and diffuse, severe, with emphysema, consistent with clinical diagnosis of anthracosis'. The preliminary frozen section report by Dr. McMurry having commented that the tissue we biopsied was consistent with an ethological impression of silicosis.

Q. In your opinion, Doctor, this condition that you discovered as a result of the biopsy on Mr. Cole—is it in any wise disabling to this gentleman?

A. The pulmonary function state of the patient is disabling and the assumption that the pulmonary fibrosis is causally connected with the finding of ventilatory impairment would permit the assumption that he is disabled by reason of the pulmonary fibrosis." Deposition of Dr. Shelton E. Domm, pages 9, 10.

### III.

◾ Defendant says the trial court erred in refusing the request to find what occupational disease he based the recovery on. Defendant's contention pursuant to this assignment of error is lacking in specificity, but we conclude that it presupposes the necessity that one of the twelve (12) diseases listed in T.C.A. § 50–1101 must be singled out and the disease plaintiff suffers from described medically as closely related thereto.

The first non-scheduled disease held to be a closely related compensable occupational disease was pulmonary fibrosis. *Whitehead v. Holston Defense Corporation,* 205 Tenn. 326, 326 S.W.2d 482 (1959). Therein Chief Justice Neil, writing for the Court said:

"While it is true the Legislature listed nine occupational diseases as compensable, yet a liberal interpretation of this section does not require that the disease from which an employee suffers must be proved to that degree of scientific exactness as to classify it as one of these listed occupational diseases. Medical science, great and important as it is in serving humanity, is not an exact science. Moreover men of science have not as yet given a name to every human ailment. Some diseases are so closely related to certain classified diseases that they must be denominated as 'occupational', provided the elements of causation can be connected, either directly or indirectly, with the conditions under which an employee is re-quired to work. . . ." 326 S.W.2d at 485.

In *Maryland Casualty Company v. Miller,* 210 Tenn. 301, 358 S.W.2d 316 (1962), Mr. Justice Burnett referred to the reasoning in *Whitehead* and added the following comment:

". . . In that case, this Court held that the section covering occupations diseases, § 50–1101, T.C.A., does not require that the disease from which the employee suffers be proved to that degree of scientific exactness as to classify it as *one* of the listed occupational diseases, and also we held therein that diseases closely related to the classified diseases in causative effect must be classified as 'occupational' provided the elements of causation can be connected directly or indirectly with the conditions under which the employee was required to work. We in this case, and others therein cited, have placed a very broad interpretation upon § 50–1101, T.C.A., which is apparently calculated to offset in some measure the unusually short scheduled list. Reason, justice and common sense demand that it be so enlarged when it is shown that the end result came from the listed disease." (Emphasis added) 358 S.W.2d at 319.

In addition, Dr. Miller states that anthracosis is one type of pneumonicosis. Coal workers' pneumonicosis is a scheduled occupational disease, as is silicosis. It may be deduced from the medical proof in this case that anthracosis, silicosis, coal worker's pneumonicosis and pulmonary fibrosis are all diseases of the lung secondary to inhalation of dust and particles; that anthracosis is associated with carbon pigment inhalation, coal worker's pneumonicosis with coal dust and silicosis with silica. Dr. Miller testified that he could not say that all of the damage to plaintiff's lungs was due to carbon pigment but that, ". . . all of the damage is due to, in my opinion, a basic pneumonicosis problem."

We hold that there is ample material evidence to support a finding that plaintiff

suffers from a disease closely related to the named diseases in T.C.A. § 50–1101.

## IV.

The most serious issue in this case involves the proof of the essential element of origin in a risk connected with the employment by defendant. The problem arises because of use by plaintiff of an improper hypothetical question. First, the evidence does not support all of the facts hypothesized. The time that plaintiff spent in zinc mines between 1939 and 1956 was inaccurate. However, the more significant problem arises from the inclusion in the hypothetical question of any activity prior to plaintiff's employment by defendant in 1956. To establish that a disease had its origin and cause in a risk connected with employment by a particular employer, it should be shown that the disease did not pre-exist that employment, and that the disease was caused by a particular hazard connected with the work.

The hypothetical question posed by plaintiff to Doctors Domm and Miller was defective in providing the necessary proof that the disease did not pre-exist employment by defendant in 1956. However, we hold that the uncontradicted proof that Dr. Milligan, defendant's company doctor examined the plaintiff and approved him for employment in the defendant's zinc mine, in 1956, is material evidence to support the statutory element of origin of the disease, with or during plaintiff's employment by this defendant.

## V.

Defendant asserts that the trial court erred in admitting into evidence the findings and conclusions of doctors and hospital personnel not before the Court.

The short answer to this complaint of error is that the principal test upon which the determinative diagnosis was made was that of the pathologist, Dr. Miller. Doctor Miller was present in court subject to cross-examination, and defendant's objections to the testimony of Dr. Domm predicated upon the pathology report of Dr. Miller is patently untenable.

At the trial of the case the medical depositions of Doctors Domm and Miller were read into the record. Defendant interposed numerous objections and all were overruled by the trial judge. These objections were to every reference that Dr. Domm made to any lung studies, x-rays, tests or reports performed by doctors or persons other than Dr. Domm himself.

This Court has not ruled, directly, on the admissibility of an expert opinion based, in part, on hearsay reports of others to support his conclusion.[1]

We hold that the diagnosis and/or expert opinion of an attending physician is admissible, although based in part upon reports of other doctors or hospital technicians who are not called as witnesses, if said reports are used in the diagnosis or treatment of the patient.

The reason for this rule, which may be the minority rule, is well stated in *State Realty Co. v. Ligon,* 218 Ala. 541, 119 So. 672 (1929):

> ". . . The law recognizes that, in the practice of medicine, a diagnosis of the ailment may include a personal examination of the patient by all the methods known to science, and also the history of the case, as given by the patient or other examining physicians.
>
> This history may include a statement of present and past symptoms, the incidents connected with the beginning of the trouble, such as injury by accident, and the findings of other physicians, such as X-ray examination and blood tests. A professional opinion as to the nature, cause, and extent of the ailment, based upon all these matters in connection with and as part of the personal examination of the

---

1. See Paine, Tennessee Law of Evidence, § 176.

patient, is competent evidence. Necessarily the information coming to the physician may be largely hearsay. An exception is made because of the necessities of medical science, because the patient's statements are presumed to be made to aid a correct diagnosis and cure, and the professional reports of physicians and nurses with the same end in view."[2] 119 So. at 674.

## VI.

■ Defendant complains of error in awarding permanent disability, asserting that there is no medical evidence to support a finding of permanency.

Doctor Domm testified as follows:

"Q. And is this disability, in your opinion, temporary or permanent?

A. Well, I would assume that it was permanent. We certainly haven't been able to improve him very much with all measures known to us.

Q. Is this disability in your opinion of a minor or a considerable extent? How would you view it?

A. His breathing impairment?

Q. Yes, sir?

A. Oh, that's severe. By reason of these tests, he is totally disabled for much of anything at all." Deposition of Dr. Shelton E. Domm, page 10.

In our opinion the foregoing testimony of Dr. Domm taken in the context of his care and treatment of the plaintiff over a period of approximately one (1) and one-half (½) years is ample evidence to support a finding of ninety (90%) percent permanent disability to the body as a whole. See *Maryland Casualty Company v. Miller, supra.*

## VII.

■ Defendant alleges error in starting disability benefits on August 30, 1972.

While it is true that the diagnosis upon which the claim is predicated was not made until August, 1973, plaintiff was under the care and treatment of Dr. Domm from August, 1972, forward. While his principal complaint and symptom was difficulty in breathing, a number of complicating symptoms intervened. Dr. Domm saw fit to check them all thoroughly because, ". . . we might be missing some rare condition that might be attributing to all of these apparently non-related troubles."

There is ample material evidence, medical and lay, to support a finding that plaintiff was disabled from and after August 30, 1972, as a result of lung disease.

Last, defendant asserts as error the trial court's allowing recovery for medical bills incurred by plaintiff from and after August 30, 1972. Defendant's brief asserts in support of this assignment of error that the court allowed plaintiff to recover "for all medical expenses incurred by Mr. Cole from and after August 30, 1972, . . ." and that the proof shows that many of the conditions claimed by Mr. Cole had no relation to the lungs. The final decree entered by the trial court provides as follows with respect to the payment of medical expenses:

". . . that plaintiff have and recover of the defendant all medical and hospital expenses incurred as a result of care, treatment and diagnosis (including diagnostic efforts expended by the various doctors herein) from and after August 1972 to present, . . ."

Unlike negligence cases, liability for medical expenses in a workmen's compensation case are governed by the statute. T.C.A. § 50–1004 provides, inter alia, that the employer shall furnish to the employee such medical and surgical treatment, etc., ". . . as ordered by the attending physician . . . as may be reasonably required . . .".

2. Similar reasoning from the Wisconsin case of *Sundquist v. Madison Railroad,* 197 Wis. 83, 221 N.W. 392 (1928) was apparently approved in *Fidelity and Casualty Company of New York v. Treadwell,* 212 Tenn. 1, 367 S.W.2d 470 (1963). However, application of this rule was unnecessary to the decision in that case.

Doctor Domm, the attending physician ordered all of the tests and consultations with other doctors that defendant complains of. Defendants premise that several of plaintiff's symptoms are unrelated to the eventual diagnosis of lung disease has no medical support in the record. We agree that they appear to the lay observer to be unrelated, but the fact remains that Dr. Domm obviously was of the opinion that they could be related or in some way could aid in the diagnosis of plaintiff's principle problem of shortness of breath. Thus, there is material evidence to support a finding that said expenses were reasonably required. Further, this assignment of error does not meet the specificity requirements of Rule 14(2) of this Court.

The judgment of the trial court is affirmed. Defendant will pay the costs of this appeal.

COOPER, HENRY and HARBISON, JJ., and HYDER, Special Justice, concur.

BROCK, J., not participating.

OPINION ON PETITION TO REHEAR

FONES, Chief Justice.

The New Jersey Zinc Company, defendant-appellant, much aggrieved by the opinion of the Court, petitions for a rehearing and reversal of our holding and that of the learned Chancellor.

First, complaint is made that we erroneously based our finding that the occupational disease had its origin and cause in a risk connected with employment by defendant, upon the pre-employment examination made for the company by Dr. Milligan, with no testimony in the record to show what his findings were.

Plaintiff testified, without objection or contradiction, that he was examined by Dr. Milligan as a prerequisite to being employed in 1956 and that the examination included x-rays of the chest. Plaintiff was not denied employment as a result of the examination and worked for defendant for the next sixteen (16) years following the examination, in a zinc mine described as heavily laden with dust, powder, diesel fumes and other injurious substances.

The Chancellor's findings implicitly, if not explicitly, included a finding that the disease from which plaintiff suffers had its origin and cause in a risk connected with that employment period. Our review is limited to a determination of whether there is any material evidence to support that finding.

"If the findings are supported by inferences which may fairly be drawn from the evidence, even though the evidence be susceptible of opposing inferences, the reviewing court will not disturb the award." (citations omitted).

\* \* \* \* \* \*

The rule of reasonable inference, where the evidence was circumstantial, has been recognized by this court in numerous compensation cases . . . ." (citations omitted). *Hartwell Motor Co., Inc. v. Hickerson,* 160 Tenn. 513, 520, 26 S.W.2d 153, 156 (1930).

The reasonable inferences to be drawn from plaintiff's testimony were that the examination was for the purpose of determining whether or not plaintiff was physically able to perform work in defendant's zinc mine and that if the examination had disclosed any evidence of an occupational disease he would not have been accepted for employment. In our view, this placed the burden on defendant to go forward with the evidence, if any existed, contrary to the reasonable inferences favorable to plaintiff, naturally flowing from said testimony. The record shows Dr. Milligan was still a company doctor in 1972, and of course defendant's officials were available to prove the company policy that existed in 1956 with respect to the purpose, extent, etc. of the required physical examination. Standing undisputed and uncontradicted, the inferences provide some material evidence on the issue under discussion, and foreclose further review by this Court.

Next defendant says there is no positive testimony in the record that plaintiff was disabled by reason of pulmonary fibrosis or anthracosis and that we failed to deal with the aspects of defendant's original assignments of error numbers two and three asserting that the Chancellor's opinion was based on speculation and conjecture.

We quote the following from *Maryland Casualty Company v. Miller, supra*:

"When there is medical testimony, it need not necessarily establish positively the nature and etiology of a disease. For example this Court affirmed an award based on the theory that a strain, accompanied by a sharp pain at the base of the neck, and followed by continuous pain, caused or accelerated a cancer that later led to the workman's death. In this case the doctors all admitted that the cause of cancer was not known. Two of the doctors testified that the strain probably aggravated the cancer and that was enough to support the award. *Boyd v. Young*, 193 Tenn. 272, 246 S.W.2d 10. We cite this case because it was the sequence of events that was convincing. The argument there made was as here that any conclusion is 'pure conjecture'." 210 Tenn. at 306, 307, 358 S.W.2d at 319.

Later in the opinion, Mr. Justice Burnett quotes the following from Larson's Workmen's Compensation, Volume 2, Section 80.-32:

" 'It is a common experience of compensation and personal injury lawyers to find that the more distinguished the medical witness is, the more tentative and qualified are his statements on the witness stand.' " 210 Tenn. at 307, 358 S.W.2d at 319.

■ In our opinion released on December 22, 1975, we have quoted what we deem to be material medical evidence to support the award, to the degree of exactness required it a workmen's compensation case and appellant's contention merely reargues its original position, which is not permitted under Rule 32 of this Court.

■ Next defendant takes issue with the rule we adopted in section five of our opinion and complains that it is in conflict with *Neas v. Snapp*, 221 Tenn. 325, 426 S.W.2d 498 (1968), *Banks v. Southern Potteries, Inc.*, 30 Tenn.App. 199, 204 S.W.2d 382 (1946), and *Tevis v. Proctor & Gamble Distributing Co.*, 21 Tenn.App. 494, 113 S.W.2d 64 (1937).

We acknowledge that the sentence immediately preceding the statement of the rule is incomplete and we condemn it to oblivion. We should have said, and we say now, that this Court has not expressly dealt with the precise factual situation involving an attending physician who obtains reports of other doctors or hospital technicians and uses them in the diagnosis and/or treatment of his patient and predicates his expert opinion on such hearsay reports and his own examination.

In that context, the rule stated in the paragraph that follows the questionable sentence is exactly as it was intended to be, and was formulated after careful examination of the cases referred to by the defendant, as well as many other cases.

In *Neas v. Snapp, supra,* the widow of an employee, seeking recovery for the death of her husband alleged to have occurred in a work related accident, testifying as a lay witness, was allowed to introduce as an exhibit to her testimony an autopsy report prepared by a pathologist. On appeal this Court held that the admission into evidence of the autopsy report was error. Defendant wholly fails to point out to us any analogy between that case and the factual situation to which we have limited the exception of the rule regarding hearsay reports. The same may be said with respect to *Banks v. Southern Potteries, Inc., supra.*

In *Tevis v. Proctor & Gamble Distributing Co., supra,* it is true that Dr. Stoechinger was a treating physician, who sent his patient to Dr. Spurling from whom he obtained a report, based upon which he eliminated any consideration of a diagnosis

of syphilis. The Court of Appeals held that testimony with respect to Dr. Spurling's report was correctly excluded by the trial court, and concluded its discussion of that issue with the following observation:

"But aside from these specific objections to the introduction of the testimony, we fail to see where it could have aided the cause of plaintiff to any great extent if admitted. As we view the testimony, it would have proved nothing, and its exclusion could not have seriously injured plaintiff." 21 Tenn.App. at 502, 113 S.W.2d at 70.

The Supreme Court denied certiorari, which insofar as precedent is concerned, is a concurrence in result only. To the extent that the rule we have announced here is in conflict with *Tevis v. Proctor & Gamble Distributing Co., supra,* that case is overruled. We have not overruled the general principles applicable to the use by expert witnesses of the hearsay reports of others, beyond the exception stated.

We are of the opinion that courts are justified in admitting in evidence, to be given such probative value as the trier of fact deems appropriate, those hearsay reports that a treating physician obtains in aid of his own treatment and diagnosis and by the use of which he necessarily places at stake, the well-being of his patient and his own professional liability and reputation.

The petition to rehear is denied.

COOPER, HENRY and HARBISON, JJ., and HYDER, Special Justice, concur.

BROCK, J., not participating.