Mary E. PULLINS and Norman E. Pullins, Plaintiffs-Petitioners,

v.

FENTRESS COUNTY GENERAL HOSPI-
TAL AND ALL–AMERICAN EXTER-
MINATING COMPANY, INC., Defend-
ants-Respondents.

Supreme Court of Tennessee.

Dec. 17, 1979.

Petition to Rehear Denied Feb. 25, 1980.

Kenneth E. Hall, Donald F. Paine, Knoxville, for plaintiffs-petitioners; Egerton, McAfee, Armistead & Davis, P.C., Knoxville, and John E. Appman, Jamestown, of counsel.

Proctor Upchurch, Crossville, for defendant-respondent, Fentress County General Hospital; Upchurch & Turner, Crossville, of counsel.

C. A. Cameron, William A. Cameron, Cookeville, for defendant-respondent, All-American Exterminating Co., Inc.; Cameron & Madewell, Cookeville, of counsel.

## OPINION

BROCK, Chief Justice.

We granted certiorari in this case to review the action of the Court of Appeals, Judge Drowota dissenting, which reversed the judgment of the trial court entered upon a verdict in favor of the plaintiffs and against both defendants in the sum of $500,000.00 and dismissed the complaint upon the ground that the trial court erred in failing to direct a verdict for the defendants.

The plaintiff, Mary E. Pullins, is the wife of plaintiff, Norman E. Pullins. She and her husband filed the complaint in this case seeking damages for personal injuries which she alleges she received by reason of sustaining a bite from a brown recluse spider while she was a patient in the defendant Fentress County General Hospital on or

about July 20, 1973. Her claim against the defendant, All-American Exterminating Company, Inc., is based upon allegations that it was under contract to provide pest control to the hospital and that the plaintiff, as a patient of the hospital, was a third party beneficiary of that contract. The legal theory of liability advanced against each defendant is that the alleged spider bite was the result of "negligence" and breach of contract on the part of the defendants.

Plaintiffs allege that the defendant hospital knew or should have known in the exercise of reasonable care that the hospital was infested with insects, including poisonous brown recluse spiders, at the time Mrs. Pullins was bitten and, thus, that the hospital failed to discharge its duty to make its premises safe for her while she was a patient therein. It is alleged that the defendant exterminating company failed to make proper inspections for spiders and also failed to take suitable measures to exterminate them. Plaintiff alleges that the complications arising from the spider bite resulted in the loss of both her feet and that she is permanently and totally disabled at the age of 22 years.

The defendants answered and denied liability.

The jury found the issues in favor of the plaintiffs and awarded damages to the plaintiffs against both defendants in the sum of $500,000.00. This verdict was challenged by a motion for a new trial but was in all things approved by the trial judge and judgment was entered accordingly.

In a split decision, the Court of Appeals reversed the judgment of the trial court, directed a verdict and ordered the complaint dismissed, its conclusion being that the evidence was insufficient to support the verdict and that the verdict was the result of speculation.

The Court of Appeals said:

"From all of the evidence the writer of this opinion is unable to escape the conclusion that in considering the plaintiff's experience at the hospital and the subsequent events, the probabilities are at least equal if not distinctly in favor of the conclusion that she was suffering from phlebitis and the after effects of the chemical Coumadin as against the possibility of the bite of a brown recluse spider.

\*　　\*　　\*　　\*　　\*　　\*

"In addition to the foregoing, it appears as a fact that in Mrs. Pullins case no spider was seen by her or by anyone else in her room, or at any place in the hospital where she might have been exposed to a spider. However, if we assume, arguendo, that the plaintiff was bitten by a brown recluse spider, there is no evidence in the record as to how the spider came to be in her room, by what method it was transported there, as to when it arrived or how long it had been there, or any other evidence that would logically lead to a conclusion of proximate negligence on the part of the hospital in connection with said spider bite."

Judge Drowota, in a dissenting opinion, stated:

"A discussion of the evidence in relation to the assignments of error sustained by the majority will clearly show that there was material evidence to support the verdict and that the trial court was not in error in failing to direct a verdict in this case. The allegation that the evidence preponderates against the verdict is not available on appeal from a jury verdict. *Cohen v. Cook*, 62 Tenn.App. 292, 462 S.W.2d 502 (1969)."

We agree with the dissent and hold that the Court of Appeals erred in directing the verdict and dismissing the complaint. In *Crabtree Masonry Co. v. C & R Const., Inc.*, Tenn., 575 S.W.2d 4 (1978), we recently stated the well settled principles governing review of jury verdicts by appellate courts in this State as follows:

"It is the time honored rule in this State that in reviewing a judgment based upon a jury verdict the appellate courts are not at liberty to weigh the evidence to decide where the preponderance lies, but are limited to determining whether there is

material evidence to support the verdict; and in determining whether there is material evidence to support the verdict, the appellate court is required to take the strongest legitimate view of all [of] the evidence in favor of the verdict, to assume the truth of all that tends to support it, allowing all reasonable inferences to sustain the verdict, and to discard all to the contrary. Having thus examined the record, if there be any material evidence to support the verdict, it must be affirmed; if it were otherwise, the parties would be deprived of their constitutional right to trial by jury. (Citations omitted.)" 575 S.W.2d at 5.

The majority opinion of the Court of Appeals discloses that these principles were not followed in this case and that the majority has undertaken to weigh the evidence and decide where the preponderance lies.

■ Our own review of the evidence in this case within the limits imposed by the foregoing principles convinces us that the verdict of the jury is supported by the evidence and should have been affirmed.

## I

About six weeks after she had given birth to a baby, the plaintiff, Mary Pullins, was admitted to the defendant hospital on July 15, 1973, at about 9:00 p. m. with the diagnosis of pleurisy. She was assigned to bed "B", next to a window, in Room 20 of the hospital. On July 18, she was given a dose of Coumadin, an anticoagulant, as a medication for phlebitis, an ailment which her physician believed was part of her problem. At about 10:00 p. m. on July 20, 1973, she awoke with a sharp pain in her left thigh and upon examination found a red pimple or blip at the point where her pain was localized. Right away the thigh began to swell, her pain became very intense and she became acutely ill and suffered shock, so that, Dr. Allred, her physician, decided to move her from the defendant hospital in Jamestown to the Fort Sanders General Hospital in Knoxville during the early morning hours of July 21, 1973, where she could be treated by Dr. James Ely, a prominent vascular surgeon.

Dr. Ely diagnosed her acute illness as systemic poisoning caused by the bite of a brown recluse spider at the site of the blister on Mrs. Pullins' left thigh.

Dr. Ely has practiced as a vascular surgeon in Knoxville since 1946 and serves on the staffs of five different hospitals. He was in charge of Mrs. Pullins' treatment for a period of about five months beginning July 21, 1973. He testified positively that it was his opinion as a medical expert that Mrs. Pullins' condition was caused by the bite of a brown recluse spider and that the bite had to have occurred within 24 to 36 hours prior to the time he saw the patient in Knoxville on July 21, 1973. Dr. Ely testified, in part, as follows:

"Q. Now, Doctor, you did run tests in an effort to eliminate things or possibilities of what was giving Mary her problem?

"A. That's right.

"Q. And you did consider all the possibilities that were known to you?

"A. That's right.

"Q. And were you able to eliminate those, Dr. Ely?

"A. Very definitely so, yes, sir.

"Q. And after all of that and the history you obtained, and based on your medical training and the observations you made of Mary, did you finally diagnose Mary's condition?

"A. I did.

"Q. And what was it?

"A. Bite of a brown recluse spider.

    *    *    *    *    *    *

"Q. Now, all of the reactions that you have related to the jury that you normally find when a brown recluse bite occurs and there is a reaction, did you find all of those in Mary's case?

"A. I certainly did and it could only be due to one thing, a bite of something with a venom.

    *    *    *    *    *    *

"Q. In your opinion, if you knew that Mary Pullins was in the hospital and bedfast for three to four days prior to coming to Fort Sanders, would the bite of the brown recluse had to have occurred in the hospital?

"A. Very definitely would have, yes, sir. I think you can pinpoint the time even shorter than that with her reaction to it.

"Q. Explain that to the jury.

"A. It would have to be within 24 to 36 hours before she came in because of her reaction.

\* \* \* \* \* \*

"Q. What did that [disseminated intervascular coagulation] do in Mary's case?

"A. Caused the loss of her toes and part of her feet because of the cutting off of the blood supply so the tissue couldn't live.

"Q. In your medical opinion did that result from the venom of the brown recluse spider?

"A. Toxicity of that venom, right.

"Q. Now, you have considered phlebitis, have you not, Dr. Ely?

"A. Definitely so, yes, sir.

"Q. Did you rule that out in Mary Pullins' case?

"A. Both then and now.

\* \* \* \* \* \*

"Q. Did you rule out the reaction that you can sometimes have to Coumadin which is taken for phlebitis?

"A. Yes sir.

\* \* \* \* \* \*

"Q. Is there any question in your mind about that diagnosis?

"A. None whatsoever; there is no other thing that will explain the whole picture."

Dr. Ely was also asked about the possibility that Mary Pullins' condition was caused by pseudomonas and he testified that her illness was not due to that organism.

Dr. Ely explained that a brown recluse spider bite causes a systemic effect as well as a local reaction at the site of the bite. He explained that the toxin of the brown recluse spider contains eight to nine "foreign proteins" which cause fibrinogen fragmentation of the blood of the patient, resulting in "dry gangrene," a condition which developed in both of Mary Pullins' feet. Dr. Ely described the fibrinogen fragmentation as follows:

"One produces emolisis, and by emolisis we mean breaking down of the red blood cells, and at the same time will effect the normal formation of fibrogen in the blood stream itself. Now, fibrogen is the basis or the foundation for any blood clot. It is normally circulated in the blood stream and whenever you have an injury such as a bruise, fibrin is what stops the bleeding because it forms with the blood cletles and forms a—rather mesh—and forms a clot that eventually develops, all you women have experienced on your arm or legs, or anywhere else. That's why a wounded soldier doesn't always bleed to death on the battlefield because a clot is formed which stops the bleeding.

"Q. Doctor, you are talking about fibrinogen fragmentation in the blood system?

"A. That's what occurs from this type of spider bite.

"Q. Did that occur in Mary Pullins?

"A. Yes it did.

"Q. Did you measure the fibrogen fragmentation?

"A. Yes sir in a test yes sir.

"Q. Was it normal?

"A. Very definitely abnormal; one of the highest we have ever taken.

"Q. Where?

"A. In the first 24 hours it was 640 as against 200 to 300 being normal and after the first 24 hours it went over 1,000 and so high we couldn't measure it.

"Q. And when you have a high reading of fibrinogen fragmentation is that in the arteries?

"A. That is in the arteries, yes, sir, and can be in the veins too.

"Q. All right how does that affect circulation of the blood?

"A. Well, when you get a severe toxin of fragment then it can lodge anywhere and that brings up the problem of what we call DIC, disseminated intervascular coagulation. Now, disseminated means it's disseminated all over the body, and a lot of these brown recluse spider victims have died from occlusion in the brain and from hemorrhage in the brain with a blood clot as a result of it, but when you fragment this it can effect anything. That little boy that died, his kidneys were stopped up and became nonfunctioning because of the fibrin fragments that causes the small tubules in the kidneys and also the small arteries in the body become stopped up and nonfunctioning and therefore the part dies.

    \*    \*    \*    \*    \*    \*

"Q. What did it do in Mary's case?

"A. Caused the loss of her toes and part of her feet because of the cutting off of the blood supply so the tissues couldn't live."

Dr. Robert Collier, who practiced general and vascular surgery in Knoxville, testified that he was called in by Dr. Ely early on Sunday, July 22, 1973, as a consultant and examined the plaintiff and that he agreed completely with Dr. Ely's diagnosis that Mrs. Pullins' condition was caused by the bite of a brown recluse spider.

The foregoing is a summary of the expert medical testimony favorable to the verdict of the jury.

There was, of course, medical testimony to the contrary. Thus, two other medical experts, Dr. Bruce Bellomy and Dr. Wayne Smith, were called as witnesses for the defense and each stated his opinion that Mrs. Pullins' condition was not caused by the bite of a brown recluse spider. Dr. Bellomy was of the opinion that the plaintiff's condi-

tion was probably "a cutaneous gangrenous reaction to Coumadin." He admitted, however, that a case could also be made for the theory that a brown recluse spider bite could cause a systemic effect in the patient and even death and that it typically caused a deep necrosis such as Mrs. Pullins suffered on her thigh. Dr. Bellomy also testified that Dr. Ely was an excellent physician and was in a better position to diagnose the plaintiff's case than was he who did not treat the plaintiff.

The presence of spiders in the defendant hospital and the likelihood that Mrs. Pullins was bitten by one is also supported by the testimony of several lay witnesses:

Ester Waters, a nurse at the defendant hospital, testified that approximately one year earlier, in July, 1972, while employed by the defendant hospital she was bitten by a spider while in a bathroom located about ten feet from Room 20, the room to which Mrs. Pullins was assigned. She reported this incident to the Superintendent of Nurses of defendant hospital at the time.

Betty Ford testified that after Mrs. Pullins was removed from the defendant hospital and was a patient in the Knoxville hospital, she, Mrs. Ford, was in the defendant hospital and killed a large spider in a bathroom there and also saw a lot of little spiders.

Johnny Pyle, the maintenance supervisor of the defendant hospital since 1972, appeared as a witness for the defense but testified that he had seen roaches in the hospital, that he had also seen spiders inside and outside the hospital, and that there were open cracks around the air conditioner units located in the windows of the hospital through which one could see to the outside. He further testified that he heard about nurse Waters being bitten by a spider in July, 1972, while in a bathroom about 20 feet from Room 20 which Mrs. Pullins occupied in 1973.

Charlene Cravens appeared as a witness for the plaintiff and testified that while visiting her sister when she was a patient in the defendant hospital on July 26, 1973, she

killed a brown spider and a roach on her sister's hospital bed and also that on another occasion when she was a patient herself in the hospital in 1974 she killed three brown spiders in the hospital.

Mr. Louis Finley, an employee of the Orkin Exterminating Company, testified that he made an inspection of the defendant hospital in the summer of 1973, after Mrs. Pullins had been a patient there, which revealed that the defendant hospital, both inside and outside, was infested with spiders; that there were cracks around the air conditioning units of the hospital and that his company was employed by the defendant hospital to rid the hospital of "rats, mice, spiders, roaches, crickets and beetles." He further testified that Rooms 19, 20 and the emergency room were listed as "problem areas" in the contract between his company and the defendant hospital. He further testified that a spider is known in the exterminating trade as a "pest."

John Howard, a witness for the defense, testified that he was employed by the defendant, All-American Exterminating Company, to perform the extermination services for which the defendant hospital had contracted and that, according to his authority, "Handbook of Pest Control," spiders bite when they are squeezed and trapped or crushed in clothing or in bed.

Mr. Howard Bruer, Tennessee State Entomologist, testified that people are often bitten by spiders while in bed; that the brown recluse spider's bite causes a local reaction and a systemic reaction as well; and that it would be highly unusual for a brown recluse spider to be brought into the hospital room on somebody's person. He further testified that the average person would find it most difficult to distinguish between a brown recluse spider and other brown spiders.

As already indicated, it is our opinion that the evidence outlined above is sufficient to support a finding that Mrs. Pullins was bitten by a brown recluse spider while in her hospital bed in the defendant hospital and that her injuries and disability resulted from the reaction of her body to the toxin injected by the spider bite.

We are also of opinion that the evidence supports a finding that the plaintiff suffered the spider bite by reason of the negligence and breach of contract on the part of each of the defendants. We outline such evidence as follows:

Mr. Bill W. Ragland, the Administrator of the defendant hospital, testified that "of course, a broad policy dictates that you must eliminate pests." He acknowledged the duty of the hospital to "provide a sanitary environment to avoid sources and transmission of infections."

Dr. Ely testified that it was the duty of every hospital to its patients to eradicate pests such as spiders.

John Howard, an employee of the defendant, All-American Exterminating Company, who undertook to exterminate the pests in the defendant hospital testified that he received no instructions from his company with respect to servicing the hospital contract; that he doesn't know whether he ever went all the way around the hospital building in performing his inspection and exterminating duties; that he had never received instructions from either of his employers' two licensed exterminating men, one of whom lived in Murfreesboro and the other of whom lived in Nashville; that he did not go into each room of the hospital when servicing the hospital; that spiders bite when squeezed and trapped or crushed in clothing or in bed according to the "Handbook of Pest Control," an authority with which he was familiar; and that he held himself out as one who can control pests.

Howard Bruer, the State Entomologist, testified that before July, 1973, Mr. John Howard was not certified "to go out on a job and obtain the contract and service that job without supervision."

Mr. Michael Hurd, who served as administrator of the Cookeville Hospital from 1971 to 1975, testified that it was a part of the duty of a hospital administrator "to know whether or not there are pest problems and to be observant and see that they

are taken care of." He further testified that it was the primary duty of the hospital housekeeper to do so.

Mr. Lloyd McKelvy, trained as an entomologist and employed in the extermination business, testified that if asked by a hospital to service it he would first inspect it both inside and outside; and, that "general pest control" covers every kind of pest—from rats to chiggers. He also testified that the brown recluse spider is difficult to identify by the average person because it looks very much like harmless ones.

Mr. Alfred Foster, president of the defendant, All-American Exterminating Company, testified that John Howard had a termite license but not a general pest license and that he "just assumed that Howard knew what he was doing." He stated that his company employed two men who were licensed pest men, but neither of them ever went to the defendant hospital; that only John Howard serviced the hospital.

In our opinion, the jurors, as reasonable people, could conclude from the above recited evidence that the defendant hospital failed to discharge its duty to make its premises safe for the plaintiff and other patients and that it knew or should have known that it was subjecting its patients to the danger of brown recluse spiders and other pests and failed to take reasonable measures to protect its patients from such pests; and, further, that the defendant exterminating company violated its contract with the hospital and with Mrs. Pullins as a third party beneficiary of such contract in that it failed to properly inspect for and exterminate spiders and other pests and employed for the purpose of servicing the hospital contract a person who was uncertified, unlicensed and incompetent to properly perform the duties thus undertaken, and, that these violations of duty on the part of each of the defendants proximately caused the plaintiff's injuries.

As indicated earlier in this opinion, the majority of the Court of Appeals in this case sought to apply what it referred to as the "equal probabilities rule," in reaching its conclusion that a verdict should have been directed for the defendants. Actually, that "rule" is nothing more than a particular method of stating the fundamental requirement that a plaintiff must support his theory by a preponderance of the evidence. This burden of the plaintiff is well stated by Professor Prosser in his *Prosser on Torts,* Hornbook Series (1941) at 326 as follows:

"The burden of proof is upon the plaintiff, and he must sustain it by more than mere speculation or conjecture. But he need not negative entirely the possibility that the defendant's conduct was not a cause, and it is enough that he introduces evidence from which reasonable men may conclude that it is more probable that the event was caused by the defendant than that it was not."

*See also Harmon v. Richardson,* 88 N.H. 312, 188 A. 468 (1936) in which the court described the degree of burden on the plaintiff as ". . . a little more probable than otherwise."

■ Our own Court of Appeals in *Johnson v. Ely,* 30 Tenn.App. 294, 205 S.W.2d 759 (1947) correctly stated the law as follows:

"It was for the jury to weigh the probabilities in the light of all the proof and determine the weight of the inferences to be reasonably drawn from the circumstances relied upon by [the] plaintiff in the light of the possibilities or probabilities appearing from the proof offered by defendant. Because there were possibilities or even probabilities opposed to the circumstantial evidence in the case did not overcome as a matter of law the force of the circumstantial evidence, and in such a case a verdict based on the whole evidence [will] not be the product of speculation and conjecture." 205 S.W.2d at 763.

This statement from the *Johnson* case was quoted with approval and followed in *Crowe v. Provost,* 52 Tenn.App. 397, 374 S.W.2d 645 (1963).

■ In our opinion the error of the Court of Appeals lay not in its statement of the so

called "rule of equal probabilities," but in its confusion of the relative roles to be played by the jury and a reviewing court. Thus, it is proper for the jury as triers of the facts to apply the "rule" in any case and, likewise, proper for the trial court to give instructions to the jury with respect to that rule, but the occasions when it would be proper for a reviewing court to apply the rule are few, indeed.

The proper roles for the court and the jury, respectively, to play in determining causation are stated in the Restatement of the Law of Torts, American Law Institute (1934), § 434, as follows:

"It is the duty of the court to determine whether, upon the facts which are admitted, found by special verdict or reasonably inferable from the evidence, the actor's conduct is a substantial factor in bringing about harm to another, unless the question is open to a reasonable difference of opinion, in which case it is to be left to the jury.

"Comment:

\*     \*     \*     \*     \*     \*

"c. The question of what actually occurred in any particular case is for the jury, unless this is agreed upon, admitted by the pleadings, found by special verdict or unless the testimony is so undisputed and uncontradictory that there is only one inference which reasonable men could draw from it. If this is the case, the court must determine whether the actor's conduct is a substantial factor in bringing about the plaintiff's harm, unless this question is itself open to reasonable difference of opinion, in which case it is for the jury.

"If the evidence is conflicting or, although not contradictory, is open to two or more reasonable inferences as to what actually took place, the case must be left to the jury."

■ Applying these principles to the instant case, it is obvious that "what actually occurred" in this case was not agreed upon, admitted by the pleadings nor found by special verdict; and, further, the testimony is not undisputed and uncontradictory so that there is only one inference which reasonable men could draw from it. Clearly, therefore, the issues of actual causation and of proximate causation in this case were factual ones properly for determination by the jury and not by the Court of Appeals. In short, it was not the proper province of the Court of Appeals to determine, as it did, that "the probabilities are at least equal if not distinctly in favor of the conclusion that she [Mrs. Pullins] was suffering from phlebitis and the after effects of the chemical Coumadin as against the possibility of the bite of a brown recluse spider." This was an invasion of the province of the jury as fact-finders.

The defendants have filed some cross assignments of error which we have also considered but found to be without merit or to have been answered by what we have already said in this Opinion.

The judgment of the Court of Appeals is reversed; the judgment of the trial court is affirmed and this cause is remanded to that court for execution upon the judgment and for any other proceedings which may be proper. Costs will be borne by the defendants.

FONES, COOPER, HENRY and HARBISON, JJ., concur.

## OPINION ON PETITION TO REHEAR

BROCK, Chief Justice.

The defendants have filed a petition to rehear which the Court has considered but found to be without merit.

■ A petition for rehearing will not be granted which merely reargues petitioner's original position. Supreme Court Rule 32; *New Jersey Zinc Co. v. Cole*, Tenn., 532 S.W.2d 246 (1975).

■ A rehearing will be refused where no new argument is made, no new authority is adduced and no material fact is pointed out as having been overlooked. *Insurance Co. of North America v. Cliff Pettit Motors, Inc.*, Tenn., 513 S.W.2d 785 (1974).

The proper office of a petition to rehear is to call attention of the Court to matters which were overlooked in the original opinion, not those matters which counsel supposes to have been improperly decided after full consideration. *Clover Bottom Hospital and School v. Townsend,* Tenn., 513 S.W.2d 505 (1974).

The instant petition does nothing more than reargue matters previously argued and considered by the Court. Accordingly, the petition to rehear is overruled.

FONES, COOPER, HENRY and HARBISON, JJ., concur.