GENE S. CROWE, et ux., Plaintiffs—Defendants-in-Error, v. DR. EDWIN K. PROVOST and MRS. R. B. McKEE, Defendants—Plaintiffs-in-Error.—374 S. W. (2d) 645.

Middle Section, Nashville. May 17, 1963.

Certiorari Denied by Supreme Court November 6, 1963.

400

Shelton & Shelton, M. A. Peebles, Sam D. Kennedy, Columbia, for plaintiffs in error.

Henry & Henry, Pulaski, for defendants in error.

CHATTIN, J. The plaintiffs below, Gene S. Crowe and wife, recovered a judgment of $25,000.00 for the alleged wrongful death of their son, Kyle Crowe, against the defendants, Dr. Edwin K. Provost and Mrs. R. B. McKee. The defendants have appealed in error to this Court.

The son, Kyle Crowe, age twenty-two months, awakened on the morning of March 4, 1961, ill. The child was taken to the office of Dr. Provost about nine thirty o'clock the same morning.

The defendant, Mrs. R. B. McKee, was employed by Dr. Provost as an office nurse. She had had some twenty-five years experience as a practical nurse and had been in the employment of Dr. Provost for twelve years.

Dr. Provost gave the child a routine examination. He was of the opinion the child was suffering from naso-pharyngitis, an infection of the tonsils and throat.

Mrs. McKee was directed by Dr. Provost to administer an injection of four hundred thousand units of penicillin in the hip of the child. He also gave Mrs. Crowe a prescription for Cosa-Terrabon, an antibiotic, to be given the child in the treatment of the infection.

At ten thirty o'clock Mrs. Crowe gave the child a dose of the Cosa-Terrabon.

The child continued to be upset and feverish. At about eleven thirty o'clock the child's condition suddenly changed and he seemed to become critically ill.

The child was rushed to the office of Dr. Provost. Dr. Provost had left the office. Mrs. McKee called for the Doctor at his home and left word for him to call. A few minutes after twelve o'clock Dr. Provost returned the call and Mrs. McKee told him the mother of the child had told her she thought the child was much worse than he was at the time Dr. Provost examined him. She also told him the mother had said she thought the child had had a convulsion. She further stated to the Doctor she had taken the child's temperature under his arm and it was 99 3/5 degrees. She told Dr. Provost the child seemed to be in the same condition he was at the time of the examination. Upon this assurance, Dr. Provost stated he would have his lunch and then return to the office.

Miss Faye Lentz, Dr. Provost's office receptionist, returned from lunch and Mrs. McKee left the office for her lunch.

A very few minutes after Mrs. McKee left the office the child's condition became worse and he vomited while lying on his back on a treatment table. He died within a few minutes after he vomited and prior to the return of Dr. Provost and Mrs. McKee.

It is the theory of plaintiffs' declaration that Dr. Provost negligently caused to be administered powerful drugs to the child without ascertaining whether he was allergic to same; that he failed to make a proper diagnosis; that he abandoned the patient in that he failed to respond to a call for treatment of an unconscious and dying child who had been entrusted to his care; that the

defendant, Mrs. McKee, while acting as a nurse, employee and agent of defendant, Dr. Provost, either made a false report to her employer or failed to make a proper diagnosis of the child; that she negligently abandoned an unconscious patient in need of nursing and medical care; and that she negligently failed to exercise the standard of care required of an office nurse in that locality; and as a result of the aforesaid acts of negligence, or one or more of them, the child was caused to die.

The defendants filed special pleas to the declaration in which they averred that Dr. Provost possessed and used that degree of skill in his diagnosis and treatment of the patient possessed by physicians engaged in the practice of medicine in that locality; that Mrs. McKee possessed and used that degree of skill possessed by office nurses in that locality; that Mrs. McKee requested and received permission from Mrs. Crowe to leave for her lunch. The defendants denied the child was unconscious and that they had abandoned an unconscious patient. Both defendants averred the death of the child was sudden and unexpected due to an overwhelming virus infection; and, therefore, not due to any negligence upon the part of either defendant.

The defendants moved for a directed verdict at the conclusion of plaintiffs' proof which was overruled. Defendants did not stand on their motion, but offered the testimony of Dr. Provost, Mrs. McKee, and Miss Lentz; together with the testimony of six reputable and practicing doctors of Columbia and Nashville.

At the conclusion of all the proof the court again overruled defendants' motion for a directed verdict.

The basis of defendants' first, second, and third assignments of error is the trial court's action in overruling their motion for a directed verdict. Defendants' fourteenth assignment is there is no evidence to support the verdict of the jury.

We will consider these assignments together.

It is conceded by the defendants Mrs. McKee was negligent in leaving the patient under the circumstances; that she was the agent and servant of Dr. Provost and he would be vicariously liable for her negligence provided it contributed as a proximate cause of the death of the child.

Accordingly, the only question for our determination, with respect to these assignments, is whether the jury was justified under the evidence in the case in finding the negligence of Mrs. McKee contributed as a proximate cause of the death of the child.

In deciding this question, we must consider the whole proof, construe it in the most favorable light of the theory of the plaintiffs, take as true the evidence which tends to support that theory, discard all inconsistent or countervailing evidence, and allow all reasonable inferences from it favorable to plaintiff's insistence. Spivey v. St. Thomas Hospital, 31 Tenn. App. 12, 211 S. W. (2d) 450; Sepaugh v. Methodist Hospital, 30 Tenn. App. 25, 202 S. W. (2d) 985.

Mrs. Crowe testified substantially as follows: The Deceased, Kyle Crowe, was a healthy twenty-two month old child prior to March 4, 1961. On that morning about seven o'clock he became ill. At nine thirty o'clock Mrs. Crowe took the child to the office of Dr. Provost. Dr.

Provost made a routine examination of the patient. He diagnosed the condition of the child as nasopharyngitis, a mild infection of the throat and tonsils. Under orders of Dr. Provost, Mrs. McKee administered a shot of penicillin in the hip of the patient, without either inquiring of Mrs. Crowe whether the child was allergic to penicillin or making any tests to ascertain that fact. The Doctor wrote a prescription for Cosa-Terrabon to be used in further treatment of the infection.

At ten thirty o'clock the same morning, Mrs. Crowe gave the child a dose of Cosa-Terrabon. Within an hour, the child suddenly screamed and threw his arms over his head and lapsed into a condition of unconsciousness.

Mrs. Crowe arrived at the office of Dr. Provost about eleven forty-five o'clock. The Doctor had gone for his lunch. Mrs. Crowe told Mrs. McKee she thought the child had had a convulsion and that he was dying. The child was unconscious and his breathing was abnormal. At the request of Mrs. Crowe, Mrs. McKee called Dr. Provost but he had not arrived at his home. At twelve ten o'clock, Dr. Provost returned the call. Mrs. McKee told Mrs. Crowe the Doctor would come to the office in a few minutes. Mrs. McKee then left the office for her lunch. Miss Faye Lentz, the receptionist for the office of the Doctor, returned from her lunch as Mrs. McKee left. Within a few minutes after Mrs. McKee left the office, the child vomited and his condition seemed to grow worse. Miss Lentz called Dr. Provost at approximately twelve thirty-five o'clock and told him the child's condition was worse. He arrived at the office about one o'clock and after the child had died.

After the child vomited, Mrs. Crowe raised him up and held him in an upright position. But when she did this his

breathing seemed shorter than while lying on his back on the treatment table. Vomit and phlegm continued to run out of his nose and mouth and his breathing became faint. His lips became a dark color. The child died a few minutes before the defendants returned to the office.

After Dr. Provost returned to the office and examined the child, he stated to Mrs. Crowe he did not know what caused the child's death.

Henry Dawson, a policeman and an uncle of Mrs. Crowe, came in the office after the child had vomited. When he arrived the child seemed lifeless. He tried to arouse the child but was unsuccessful. After the child died, he undertook to revive him by mouth to mouth artificial respiration. He was unable to do so because of the amount of phlegm and vomit oozing from the mouth of the child.

Mrs. Frances Brooks, a registered nurse and a graduate of the University of Tennessee School of Nursing, testified she had seventeen years of experience as a nurse and had served eighteen months in the army nursing corps during World War II as a Second Lieutenant. She further testified if the child had had a convulsion prior to arriving at the Doctor's office and was unconscious and breathing irregularly, such symptoms would indicate a need for immediate medical attention; and that under such circumstances standard nursing procedure would require the nurse to notify the doctor and remain with the child until he arrived. She further testified a nurse would have known not to leave a child on its back or to hold him in an upright position while vomiting. That a child in such a position while vomiting would cause the

vomitus to drain into the lungs and choke or drown the child.

Mrs. Brooks also testified there were a number of things a nurse could have done for the patient while he was vomiting such as turning him on his side or his stomach; taking her finger, or using a bulb syringe, to extract the vomitus from the patient's mouth; and that in an emergency a nurse could administer a stimulant.

She further testified persons can drown or choke to death from the aspiration of their vomitus.

Mrs. McKee admits that had she been at the office when the child vomited she would have known to have used her finger, or a bulb syringe, to extract the vomitus. She would have known not to have held the patient in an upright position; but to have turned the child on his side or stomach.

Dr. Provost testified he examined the child when he returned to the office. That there was some frothy saliva in the child's mouth which is a terminal thing that happens during death. The child was not cyanotic either on his lips or under his fingernails. He testified when a person drowns in his own vomitus he will become cyanotic on his lips and under his fingernails. He was, therefore, definitely of the opinion the child had not died from the aspiration of his own vomitus but had died from an overwhelming virus infection. He denied he had told Mrs. Crowe or anyone that he did not know what caused the death of the child.

He was of the further opinion, he nor Mrs. McKee could have done nothing to have saved the life of the child had they been present.

He admitted on cross examination the death of a person can be caused by the aspiration of his own vomitus.

Dr. Core testified there had been a number of children in the Nashville area to die a sudden and unexpected death from an overwhelming virus infection. These deaths all occurred during the months of January, February and March.

All the other doctors testified to hypothetical questions that they were of the opinion Dr. Provost used the standard professional skill used by doctors in that locality in his examination and treatment of the child.

They were of the further opinion the child died from an overwheming virus infection and there was nothing either Dr. Provost or Mrs. McKee could have done for the child had they been present.

On cross examination both Dr. Overall and Dr. Jernigan admitted the death of a person may be caused by the aspiration of his own vomitus.

Dr. Core and Dr. Overall admitted that the majority of sudden and unexpected deaths occur to children under twelve months of age and rarely to older children.

Defendants' theory of their motion for a directed verdict is, conceding Mrs. McKee was negligent in failing to attend the child, this is not sufficient upon which to base a finding that such negligence was the proximate cause of the death of the child. Specifically, defendants contend all the medical proof shows conclusively the child died from an overwhelming virus infection; and, therefore, all reasonable minds must agree this testimony destroyed the probative force of the circumstances offered

by plaintiffs in making out their case the child died from the aspiration of his own vomitus.

But we cannot agree to this insistence under the facts of this case. We are of the opinion the plaintiffs have shown by credible proof the child vomited while lying on his back in an unconscious condition to such an extent it was impossible to administer mouth to mouth artificial respiration; that persons may aspirate their own vomitus and cause their death; and had either of the defendants been present at the time each would have known the proper methods of administering to the child.

We think jurors of ordinary intelligence and judgment, although not skilled in medical science, are capable of reaching a conclusion without the aid of expert testimony, from these proved facts and circumstances, whether injurious consequences or death would probably result to the patient without proper medical or nursing attention.

It is true Dr. Provost testified the child died of an overwhelming virus infection, and his testimony to this effect is corroborated by the opinions of the other doctors in answer to hypothetical questions. However, there is testimony in the record Dr. Provost had made statements, after the death of the child, to members of the Crowe family he did not know what caused the child's death. It is admitted by all the doctors a majority of sudden and unexpected deaths occur in children under twelve months of age.

"Opinions of medical experts as to the cause of death, disease, or personal injuries, either in answer to a hypothetical question or based on personal observation and examination, do not invade the province of the jury,

but go to them to be weighed along with the other evidence in passing on the question of causation; or, stating the rule more broadly, when expert opinion as to causation is admissible, the weight of the opinion is to be determined by the jury." 20 Am. Jur., Evidence, Section 867, page 731; Nashville, Chattanooga & St. Louis Railroad Company v. Jackson, 187 Tenn. 202, 213 S. W. (2d) 116.

■ "The rule that a verdict in a malpractice action cannot be based on speculation or conjecture as to cause does not. necessarily require that the plaintiff prove causation by direct and positive evidence, which excludes every other possible hypothesis as to the cause of the injuries, it generally being held that if a fair preponderance of the evidence discloses facts and circumstances proving a reasonable probability that the defendant's negligence or want of skill was the proximate cause of the injury, the plaintiff has supported his burden of proof sufficiently to justify a verdict in his behalf." 13 A. L. R. (2d) Annotation, Proximate Cause, Malpractice Actions, Section 4, page 28; Johnson v. Ely, 30 Tenn. App. 294, 205 S. W. (2d) 759.

In the same annotation, 13 A. L. R. (2d), Section 5, at page 34, it is said: "Although recognizing the rule that expert testimony is ordinarily necessary to establish causation in malpractice cases, several cases have held that under some circumstances where the negligence and harmful results are sufficiently obvious as to lie within common knowledge, a verdict may be supported without expert testimony."

"It is not necessary to prove beyond a shadow of a doubt that an injury was caused by negligence preceding it, but a showing of strong probability of the causal re-

lation is sufficient. * * * Where negligence and injury are proved, a causal connection between them may be established by circumstantial evidence, by inferences from physical facts." Medical Jurisprudence by Dr. Herzog, Section 186, pages 161, 162.

"Questions capable of exact demonstration are rarely the subject of litigation. No such burden rested on the plaintiff. He was not bound to exclude all possible causes of death. He was required only to make it more probable than otherwise that the fact was as he claimed it." Boucher v. Larochelle, 74 N. H. 433, 68 A. 870, 15 L. R. A., N. S., 416.

As the Court said in the case of Dimock v. Miller, 202 Cal. 668, 262 P. 311: "[If] it is necessary to demonstrate conclusively and beyond the possibility of a doubt that the negligence resulted in the injury, it would never be possible to recover in a case of negligence in the practice of a profession which is not an exact science."

▮▮ "Any fact may be proved by direct evidence, circumstantial evidence, or a combination of direct and circumstantial evidence. In civil cases facts are proved by a preponderance of the evidence. If unequal conflicting probabilities, or unequal inconsistent theories are shown by the evidence; or if the minds of reasonable men might differ from the proved facts as to whether the conflicting probabilities, or inconsistent theories, are equally supported by the evidence, the case must go to the jury." Phillips, et al v. Newport, et ux., 28 Tenn. App. 187, 187 S. W. (2d) 965.

▮▮ Accordingly, we are of the opinion the medical proof in the record that some condition for which defendants would not be liable because not due to any act

of negligence on their part might have caused the death of the child does not destroy or overcome as a matter of law the probative force of the evidence that the more probable cause was the negligence of the defendant nurse in abandoning an ill and unconscious child.

As was said in Johnson v. Ely, supra: "It was for the jury to weigh the probabilities in the light of all the proof and determine the weight of the inferences to be reasonably drawn from the circumstances relied upon by plaintiff in the light of the possibilities or probabilities appearing from the proof offered by defendant. Because there were possibilities or even probabilities opposed to the circumstantial evidence in the case did not overcome as a matter of law the force of the circumstantial evidence, and in such a case a verdict based on the whole evidence would not be the product of speculation and conjecture."

Hence, we must overrule defendants' first, second, third and fourteenth assignments.

The basis of defendants' fourth assignment of error is the trial court's action in not sustaining defendants' objection to the argument of plaintiffs' Counsel that doctors will rally to the defense of a fellow doctor in a malpractice suit.

"It is well settled that the latitude of argument is under the control of the court; that it must be left largely to the ethics of the profession and the discretion of the trial judge." Hager v. Hager, et al., 17 Tenn. App. 143, 66 S. W. (2d) 250.

To justify a reversal of the judgment for the misconduct of an Attorney in the conduct of a case, it

must affirmatively appear to this Court that it affected the results of the trial. T. C. A. sec. 27-117.

We are of the opinion from a review of all the evidence in the case, the results would have been the same if the argument had not been made.

Thus, we overrule assignment four.

Defendants' fifth assignment complains of the action of the court in permitting plaintiffs' counsel during his argument to place a life size photograph of the deceased child in the witness stand and asserting what the child would have testified if living.

We must overrule this assignment, since it does not appear the defendants objected to this procedure of counsel. We cannot put the trial court in error under these circumstances. Ferguson v. Moore, 98 Tenn. 342, 39 S. W. 341.

Defendants' sixth and seventh assignments challenge the action of the trial court in permitting counsel for plaintiffs to read excerpts from the discovery depositions of the defendants, Dr. Provost and Mrs. McKee, requiring each to state as a conclusion that certain acts or omissions in the treatment of a patient would be negligence on the part of the other. We do not think an office nurse is qualified to testify as to the standard of skill required of a doctor in the practice of his profession. Nor do we think a doctor should be permitted to testify as a conclusion that a nurse would be negligent in the practice of her profession under certain circumstances. Such testimony would invade the province of the jury. However, as pointed out, defendants admit Mrs. McKee was negligent in abandoning the patient under

the circumstances. Thus, the action of the trial court in this respect was harmless error. T. C. A. sec 27-117.

Accordingly, assignments six and seven are overruled.

Defendants' tenth assignment must be overruled. This assignment complains of the failure of the trial court to charge a special request submitted to the court by defendants. However, the record shows this request was granted and read to the jury.

Assignment eleven would put the trial court in error for not discharging the jury after the jury stated to the court during the second day of their deliberations they were divided ten and two and thought there was no chance of reaching a verdict.

This assignment must be overruled. There was no objection made by defendants to this action of the court. Under these circumstances we cannot put the trial court in error. Rule 11(4) Court of Appeals.

Defendants' twelfth assignment complains of the action of the trial court in refusing to charge defendants' special requests seven and eight.

We think the trial court was correct in refusing to charge these requests since they were covered in the charge as given by the court.

These requests contained a charge that it is uncontradicted from the medical testimony that Dr. Provost exercised reasonable and ordinary care and diligence in his diagnosis and treatment of the patient; and, therefore, the jury could not consider the actions of Dr. Provost as responsible for the death of the child; but could only consider his liability as the employer of the defendant, Mrs. McKee.

██ Such a charge, under the facts and pleadings of this case, we think, is enjoined by Article 6, Section 9, of our Constitution. In any event, the situation is covered by the harmless error statute, T. C. A. sec. 27-117, since the jury returned a general verdict.

Assignment twelve is overruled.

The thirteenth assignment of error complains of the action of the trial court in refusing to charge the jury the law of contributory negligence.

This assignment stems from the fact that Mrs. Crowe testified she did not give the child the dose of Cosa-Terrabon from a bottle shown her which bottle purportedly contained the medicine she gave the child. However, Mrs. Crowe emphatically testified she gave the child a dose of Cosa-Terrabon as prescribed.

The defendants filed a special plea by order of the court to the declaration which plea did not set up the defense of contributory negligence. It was the theory of the defendants the child died from an overwhelming virus infection.

██ Thus we are of the opinion the charge was not justified under the pleadings and evidence in the case and the trial court correctly refused the request.

Accordingly, assignment thirteen is overruled.

There remains assignments of error eight and nine for our consideration.

Assignment eight challenges the trial court's action in ordering the discovery of a copy of the professional liability insurance policy of Dr. Provost.

416

■ We think the court erred in ordering the discovery of the policy because it was a privileged matter; and, of course, not relevant to the issues in the case.

■ However, it is admitted in defendants' brief the jury knew nothing of its existence. Therefore, it did not affect the results of the trial and was harmless error.

Thus, we must overrule the eighth assignment.

■ Defendants' ninth assignment of error is that the verdict is excessive.

"The amount of damages recoverable in an action under the statute for wrongful death is a matter dependent most largely upon the judgment of the jury and their sound discretion, after carefully, honestly and fairly considering all the various elements that enter into the question." Highland Coal and Lumber Company v. Cravens, 8 Tenn. App. 419; Davidson Benedict Company v. Severson, 109 Tenn. 572, 72 S. W. 967.

■ "The amount of damages is primarily a question for the jury; and their verdict is entitled to great weight in this court when the trial court has approved it, if there is no claim that the verdict is corrupt or dishonest." Phillips, et al. v. Newport, et ux., 28 Tenn. App. 187, 187 S. W. (2d) 965.

Under the proof in this case the only element of damage to be considered by the jury was the pecuniary value of the life of the child. The child was only twenty-two months old and according to the theory of the plaintiffs the child was unconscious for some time prior to his death.

However, defendants do not insist the verdict was corrupt or dishonest, but only it was so large as to indicate it was influenced by passion, prejudice or caprice.

The child was a bright, robust, and healthy child prior to the day of his death.

The record shows the jury deliberated almost nine hours before returning their verdict. Evidently the amount of the damages as well as all the other phases of the case were carefully and fairly considered by this jury.

■■■ "And the great weight of authority is to the effect that substantial damages may be recovered by the parents of a minor child, * * * notwithstanding the fact that such child had never been gainfully employed, such damages to be measured by the experience and judgment of the jury, enlightened by a knowledge of the age, sex, and physical and mental characteristics of the child. * * *

■■■ "When damages are claimed for the death of a child incapable of earning anything or rendering service of any value, it has been held that the jury must make their estimate of damages from the facts proved, and it is not necessary that any witness should express an opinion of the amount of such pecuniary loss, it being proper for the jury to exercise their own judgment upon the facts proved, by connecting them with their own knowledge and experience which they are supposed to possess in common with the generality of mankind." 16 Am. Jur., Death, 1962 Cumulative Supplement, Section 216, pages 26, 27; Anno. 149 A. L. R. 235; 14 A. L. R. (2d) 539.

■■■ .Since we have no mathematical formula to guide us as to the amount of damages to be allowed in

negligence cases; we cannot say as a matter of law that we would be justified in substituting our judgment as to the amount of damages to be allowed in this case in preference to that of the jury and the trial judge who approved the verdict.

Accordingly, all assignments of error will be overruled, and the judgment below will be affirmed at defendants' cost.

Shriver and Humphreys, JJ., concur.