John J. BANDEIAN, Jr., M.D., Plaintiff/Appellant,

v.

Martin H. WAGNER, M.D., Defendant/Appellee,

Ray W. Hester, M.D., and Gerald R. Burns, M.D., Defendants.

Court of Appeals of Tennessee, Middle Section, at Nashville.

Oct. 29, 1997.

Permission to Appeal Denied by Supreme Court June 15, 1998.

John J. Bandeian, M.D., Bristol, pro se.

Ed R. Davies, Davies, Cantrell & Humphreys, Nashville, for Defendants/Appellees.

## OPINION

TODD, Presiding Judge, Middle Section.

The plaintiff, John J. Bandeian, Jr., M.D. has appealed from the summary dismissal of his suit against the defendant, Martin H. Wagner, M.D. for libel.

Plaintiff's second amended complaint asserts that an unsigned letter containing untruthful statements about plaintiff and another physician was mailed to a patient by the defendant.

Defendant's motion for summary judgment is supported by his affidavit that:

2.  I have read Exhibit 1 to the Complaint (letter said to have been postmarked on October 24, 1994 and referred to hereinafter as the or this letter).

3.  I did not write this letter.

4.  I did not commission, cause, direct, or assist any other person in the writing of this letter.

5.  I have no knowledge as to the identity of the author of this letter.

6.  I did not mail, commission, cause, direct, or assist in the mailing of this letter.

A party seeking a summary judgment may do so in several ways. *Brown v. J.C. Penney Life Ins. Co.,* Tenn.App.1992, 861 S.W.2d 834.

In a suitable case, the simplest support for a defendant's motion for summary judgment is his affidavit that "I did not commit the act attributed to me in the complaint." The plaintiff must then present admissible evidence that the defendant did commit the act attributed to him.

The present case involves such a simple situation. The complaint alleged wrongdoing by defendant. The defendant swears that he is not the guilty party. Plaintiff has attempted to produce evidence that defendant is guilty. The issue on appeal is whether the evidence offered by plaintiff is competent, admissible evidence creating a dispute as to the fact denied by defendant.

■ Plaintiff's 13–page "Statement of the Facts" is attached as an exhibit to this opinion. It would be extremely difficult to abbreviate or adequately summarize this statement. A careful study of the details of the evidence in the "statement of facts" fails to disclose any competent, admissible evidence that contradicts defendant's affidavit quoted above. No competent, admissible evidence is found that defendant wrote the letter, or that he conspired or collaborated with anyone who did, or that he and only he had a motive and opportunity to write the letter.

■ Generally, an ordinary witness must confine his testimony to a narration of facts based on first-hand knowledge and avoid stating a mere personal opinion. *Walden v. Wylie,* Tenn.App.1982, 645 S.W.2d 247. The opinion of plaintiff and that of his witnesses is not competent evidence of the participation of defendant in the alleged wrong. TRCP Rule 56.01, *Braswell v. Carothers,* Tenn.App. 1993, 863 S.W.2d 722.

■ A verdict for the plaintiff cannot be based upon speculation, conjecture, guesswork, or a mere spark or glimmer of evidence. *Ogle v. Winn–Dixie, Greenville, Inc.,* Tenn.App.1995, 919 S.W.2d 45; *Sadek v. Nashville Recycling Co.,* Tenn.App.1988, 751 S.W.2d 428.

■ When faced with a properly supported motion for summary judgment, the opponent of the motion must produce competent, material evidence showing a clear entitlement to maintain his action. *Merritt v. Wilson County Board of Zoning Appeals,* Tenn.App.1983, 656 S.W.2d 846.

If evidence filed by plaintiff in response to a properly supported motion for summary judgment does not controvert factual statements in defendant's evidence, the response is inadequate. TRCP Rule 56. *Kelton v. Snell,* Tenn.App.1985, 689 S.W.2d 186.

If the parties had gone to trial upon the evidence offered by them for and against the summary judgment, the Trial Judge would have been obligated to direct a verdict for the defendant because the evidence offered by plaintiff would have required the jury to engage in unwarranted speculation. *Stokes v. Leung,* Tenn.App.1982, 651 S.W.2d 704, *Crowe v. Provost,* Tenn.App.1963, 52 Tenn. App. 397, 374 S.W.2d 645.

The summary judgment for the defendant was therefore justified and correct.

The judgment of the Trial Court is affirmed. Costs of this appeal are assessed against the plaintiff-appellant. The cause is remanded to the Trial Court for further appropriate proceedings.

CANTRELL, J., concurs.

KOCH, J., concurs in separate opinion.

## EXHIBIT

### STATEMENT OF THE FACT'S

The following facts come from the motions and affidavits that Dr. Bandeian previously filed with the Trial Court in opposition to the Defendant's Motion for Summary Judgment. Dr. Bandeian is a surgeon in Bristol, Tennessee. (Exhibit B # 1). Mrs. Debby Messinger is the plaintiff in the medical malpractice suit against Dr. Wagner, a Nashville area neurologist, Dr. Burns, a Nashville area general surgeon, and Dr. Hester, a neurosurgeon. Messinger, Burns, Hester and Wagner are all from the greater Nashville area. (Exhibit B # 2). Dr. Bandeian has no connections with Nashville. Mrs. Messinger alleged that Dr. Burns negligently cut her spinal accessory nerve while doing a neck node biopsy. (Exhibit B # 2). She also alleged that Drs. Wagner and Hester negligently failed to recommend that she have the nerve repaired in a timely manner. (Exhibit B # 2 ). Dr. Bandeian repaired a cut nerve on Mrs. Messinger at Johnson City Medical Center (JCMC) in the spring of 1992. (Exhibit B # 3). The cut nerve is the subject of Mrs. Messinger's malpractice suit. JCMC is located in Johnson City, Tennessee. (Exhibit B # 3). During the surgery Dr. Bandeian had the circulating nurse take several pictures of the cut nerve before he repaired it. (Exhibit B # 4). After he repaired the nerve, he took a break while Dr. Pettigrew, a neurosurgeon, observed the repair. (Exhibit B # 4). While Dr. Bandeian was on break he took several pictures of the repaired cut nerve himself. (Exhibit B # 4).

When the photos were developed, Dr. Bandeian observed that the pictures taken of the nerve ends before the repair were not of adequate magnification for Dr. Bandeian to see the cut nerve ends. (Exhibit B # 5). He thought that if he examined the photos with a magnifying lens he would be able to identify the cut nerve ends. *Id.* Because of his plans to attend law school, he did not have occasion to go back to JCMC after Mrs. Messinger's surgery until several months after the anonymous letter was received by Mrs. Messinger. *Id # 6.* Dr. Bandeian has not discussed Mrs. Messinger with anyone connected with JCMC since the date of her surgery. *Id.* He has never discussed any of his personal or professional affairs with anyone connected with JCMC. *Id.* His deposition for the Messinger case was scheduled for July 6, 1994. *Id. # 7.* The day before his deposition, he studied the photos that the nurse took with a magnifying lens. *Id. # 7* Even with extra magnification, he was not able to identify the cut nerve ends well enough to demonstrate to a jury with these photos, the cut nerve ends that he could see during surgery. *Id.* At that point for the first time, he knew that he would have to testify that the photos were not of sufficient magnification to show the cut nerve ends before the repair. *Id.* Prior to that time, he had told the nurses in the operating room at JCMCH, his office staff and others that he had pictures of the cut nerve before he repaired it. *Id.* He was deposed by the lawyers representing Drs. Burns, Wagner, and Hester on July 6, 1994. *Id. # 8* Of the three defendants, only, Dr. Wagner was present at the deposition. *Id.* He made his own tape recording of Dr.

Bandeian's testimony. *Id.* During Dr. Bandeian's testimony, he admitted that, in spite of the many pictures he had of Mrs. Messinger's surgery, he did not have pictures of the cut nerve before he repaired it. *Id.* # 9 The only time, prior to the letter being postmarked, that he ever revealed to anyone that—although he had many pictures of Mrs. Messinger's surgery, he did not have any photos that showed the cut nerve ends before the repair—was during his Messinger deposition testimony. *Id.* # 10

An anonymous letter, exhibit A to his complaint was mailed to Mrs. Messinger. *Id.* # 11 It was post marked October 24, 1994 from Knoxville. *Id.* The anonymous letter contains false statements about Dr. Bandeian which are injurious to his reputation as a plastic surgeon. *Id.* # 12 Although the letter was anonymous and postmarked from Knoxville, the author of the letter indicated in the letter that he worked at JCMC in Johnson City. *Id.* # 13 The author of the letter accused Dr. Bandeian of conspiring with Mrs. Messinger's attorney, Paul Kaufman to criminally defraud her. *Id.* # 14 The author told her that Dr. Burns did not cut the nerve. *Id.* The letter accused Dr. Bandeian of intentionally cutting a nerve so that he could charge for repairing it and for testifying for Mrs. Messinger. *Id.* The letter suggested that the reason, why none of the many photos that were taken of her surgery showed the cut nerve ends, was that the nerve had not been cut until Dr. Bandeian intentionally cut it. *Id.* # 15 Only someone who was present at Dr. Bandeian's deposition or who had read the transcript could have known that among all his pictures of Mrs. Messinger's surgery, he did not have any photos of the cut nerve before it was repaired. *Id.* Dr. Wagner was present when Dr. Bandeian testified that of all the photos taken during the surgery, he had no photos of the cut nerve before he repaired it. *Id.*

Although the letter purports to have been written by someone from JCMC, there are several reasons why no one connected with JCMC could have sent the letter. *Id.* # 16 First and most important, only someone who was present at Dr. Bandeian's Messinger deposition or who had read the transcript could have known that none of the photos showed the cut nerve ends. *Id.* # 17 No one from JCMC was present at the deposition. *Id.* The only person Dr. Bandeian knows of from JCMC who has read his deposition transcript is Dr. Cupp, and that was in 1996 after the anonymous letter was mailed. *Id.* (Dr. Pettigrew was mistakenly named in affidavit.)

Second, the author of the letter wrote that Paul Kaufman and Dr. Bandeian were good buddies, but Dr. Bandeian never mentioned that Paul Kaufman and he were friends to anyone connected with JCMCH. *Id.* # 18 However, Dr. Bandeian testified about his connection with Dr. Kaufman at his Messinger deposition, and Dr. Wagner was present while he gave that testimony. *Id.*

Third, the author of the letter wrote that Dr. Bandeian had never fixed a neck nerve before. Dr. Bandeian never told anyone at JCMCH that he had never fixed a spinal accessory nerve before. However, at his deposition, he testified that he had never repaired a spinal accessory nerve before. Dr. Wagner was present when he gave that testimony. *Id.* # 19

Fourth, the author of the letter wrote that Mrs. Messinger consulted with Paul Kaufman about a medical malpractice claim in 1992. *Id.* # 20 Dr. Bandeian never revealed to anyone at JCMCH that Mrs. Messinger consulted with Dr. Kaufman about a medical malpractice claim in 1992. *Id.* # 20 However, Mrs. Messinger testified in her deposition that she spoke with Dr. Kaufman in 1992 about a malpractice claim. Dr. Wagner was present at her deposition. *Id.*

Fifth, the author of the letter wrote that Dr. Bandeian had earned at least ten thousand dollars from Mrs. Messinger's surgery and from his testimony. *Id.* # 21 Until his deposition, Dr. Bandeian had never told anyone how much money he had earned from the surgery and from his testimony. *Id.* # 21 Furthermore, he never told anyone at JCMC that he was going to give a deposition for Mrs. Messinger. *Id.* However, Dr. Wagner was present when Dr. Bandeian testified that he had earned "at least ten thousand dollars". *Id.*

Sixth, Dr. Bandeian testified in his deposition that "My primary goal was to get the lady better." *Id.* # 22 The author wrote that he knew that the real reason Dr. Bandeian operated on Mrs. Messinger was not because of some deep medical duty he felt to help a sick patient, but because Mrs. Messinger was a sucker and Dr. Bandeian wanted some easy money. *Id.* No one at JCMC was present at Dr. Bandeian's deposition, but Dr. Wagner was. *Id.*

Seventh, the author wrote: "He [Dr. Bandeian] told me he read up about it [how to do the nerve repair] in some surgery book the night before surgery ..." *Id.* # 23 Dr. Bandeian never told anyone at JCMCH that he had read up on how to do the surgery the night before the surgery. *Id.* However, he did tell all the lawyers present at his deposition as well as Dr. Wagner that he had read about the surgery in several books, the night before the surgery. *Id.*

Eight, the author wrote that Dr. Bandeian only operated on Fridays while he was in law school. *Id.* # 24 At the time Dr. Bandeian did Mrs. Messinger's surgery at JCMC, he operated Monday through Friday as necessary. *Id.* From August 1992 through December 1994, he never worked at JCMCH and never told anyone who worked there that he only operated on Fridays. *Id.* Dr. Wagner was present when Dr. Bandeian testified that he only operated on Fridays when law school is in session. *Id.*

Ninth, the author wrote about the fact that Dr. Bandeian had been sued for medical malpractice many times. *Id.* # 25 Only one of those suits was reported in the mass media, and the only way someone from JCMC could have known that Dr. Bandeian had been sued many times, would be if he checked the court records. *Id.* Dr. Wagner was present when Dr. Bandeian testified that I had been sued many times. *Id.*

Tenth, the author knew that the spinal accessory nerve normally does not run horizontally across the neck. *Id.* # 26 Operations on the spinal accessory nerve are very rare. *Id.* There is no reason why anyone who was present in the operating room with Mrs. Messinger, other than Dr. Bandeian, would have known that the nerve does not normally run horizontally. *Id.* However, Dr. Wagner was present when Dr. Bandeian testified that the nerve he repaired was running horizontally. *Id.*

Eleventh, the author knew that Dr. Bandeian was going to graduate from law school in December 1994 which was only 2 years and 4 months from the time he entered law school. *Id.* # 27 Dr. Bandeian never told anyone at JCMC when he was going to graduate from law school. Outside the law school, very few people knew when Dr. Bandeian was going to graduate. *Id.* However, Dr. Wagner was present when Dr. Bandeian testified that he was going to graduate in December. *Id.*

It is undisputed that Mrs. Messinger's shoulder drooped following her neck node biopsy that Dr. Burns did. It is also undisputed that her shoulder drooped because the spinal accessory nerve was not providing innervation to her trapezius muscle. *Id.* # 29 The biopsy report that Dr. Bandeian took of the cut nerve ends proves that the nerve had been cut, and that it had been cut long before he operated on Mrs. Messinger. *Id.* Since the nerve was cut it would never have recovered without surgery. *Id.* Dr. Bandeian testified that the nerve was not working because it was cut, and that he found the cut nerve and repaired it. *Id.* However, in the malpractice case, Dr. Wagner raised the defense that he was not negligent because **the nerve was only bruised and that it would have healed in time.** *Id.* The author of the letter adopted Dr. Wagner's defense when he wrote that Mrs. Messinger's nerve had been **only bruised and that it would have healed in time.** *Id.* The author urged Mrs. Messinger to drop her malpractice suit against Drs. Wagner, Burns and Hester, and instead sue Dr. Bandeian and Dr. Kaufman for medical fraud and assault and battery. *Id.* # 30

The author of the anonymous letter wrote in the letter: "**Dr. Bandeian read about it in some book the night before the surgery....**" *Id.* # 32

Dr. Anderson is a neurologist who also practices in the greater Nashville area. Exhibit C # 1. Anonymous defamatory letters

were written about Dr. Anderson. *Id.* # 6, # 8 He believes that Dr. Wagner wrote the letters. *Id.* He testified in paragraph 9 of his affidavit

It is my belief that Dr. Martin Wagner was the author of or participated in writing the anonymous letter about me which discussed patient histories. It is not uncommon that Dr. Wagner and I will see the same patient. We often disagree on a diagnosis and course of treatment. Dr. Martin Wagner saw at least one of the patients referenced in the letter about me. Only a neurologist who had seen the patient or discussed these patient histories with other physicians would have access to the type of information that was put into that letter. It is my belief that Dr. Martin H. Wagner wrote or assisted in the writing of that anonymous letter. The tone of the letter about me is very similar to the letter written about Dr. Bandeian which is attached to his complaint.

Dr. Kaufman stated in paragraph 4 of his affidavit (Exhibit D)

I have been involved in numerous malpractice suits against physicians over the years, both as an attorney and as a physician serving as a retained expert. I have worked mainly for plaintiffs, but I have also worked for several defendants. In the approximately 15 years that I have been extensively involved in medical malpractice suits, I have never seen a defendant react with such personal animosity over being sued as Dr. Wagner.

Dr. Kaufman stated in paragraph 10 of Exhibit D

Finally, it was my impression that, based on his reactions connected with this case, that Dr. Wagner had the temperment and personality of a person who would send this type of letter.

Referring to the anonymous letter about Dr. Bandeian and the one abut Dr. Anderson, Dr. Kaufman stated in paragraph 12 of Exhibit D

The contents and style of some of the letters concerning Dr. Anderson and Dr. Wolfe (Dr. Anderson's partner) are virtually identical to the contents and style of the letter sent to Debbi Messinger. The letters share common themes, including complaints about greedy lawyers, greedy doctors, attempts to alienate patient's trust in their doctors, and religious overtones. In addition, the letters are stylistically virtually identical, including the use of underlining and capitalizing phrases for emphasis.

Dr. Wagner filed an affidavit on June 25, 1996 in which he stated that he played no role in the publication of the October 24, 1994 writing.

### BRIEF OF THE LAW

### I. THE STANDARD FOR APPELLATE REVIEW OF TRIAL COURTS GRANT OF SUMMARY JUDGMENT.

The Appellate Court reviews the trial court's grant of summary judgment *de novo* upon the entire record with no presumption of correctness. *Brenner v. Textron Aerostructures, Inc.*, 874 S.W.2d 579 at 582.

### II. THE STANDARD FOR GRANTING A SUMMARY JUDGMENT

According to Rule 56.03, summary judgment is to be granted if the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law," Rule 56.05 provides that the nonmoving party "must not rest upon the mere allegations or denials of his pleading, but his response, by affidavits or [otherwise], must set forth specific facts showing that there is a genuine issue for trial." . . . [T]he trial court must take the strongest legitimate view of the evidence in favor of the nonmoving party, allow all reasonable inferences in favor of that party, and discard all countervailing evidence.

*Byrd v. Hall*, 847 S.W.2d 208 at 210 (Tenn. 1993).

[A]t the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a

genuine issue for trial. There is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party.... Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge, whether he is ruling on a motion or a directed verdict. The evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor.

*Id.* At 212.

## III. SUMMARY JUDGEMENT NOT APPROPRIATE WHEN CREDIBILITY OF WITNESS IS AN INTEGRAL PART OF THE FACTUAL PROOF

When **a material fact is in dispute** creating a genuine issue, when the **credibility of witnesses** is an integral part of the factual proof, or when evidence must be weighted, a trial is necessary because such issues are not appropriately resolved on the basis of affidavits.

*Id.* At 216

## IV. THE EFFECT OF CIRCUMSTANTIAL EVIDENCE

In civil cases, facts are proved by a preponderance of evidence and a fact may be proved by direct evidence or by circumstantial evidence. *Phillips v. Newport,* 28 Tenn. App. 187, 187 S.W.2d 965 at 971 (1945).

### ARGUMENT

If the Trial Court had had **believed Dr. Bandeian's evidence and drawn all justifiable inferences in favor of Dr. Bandeian** as he was required to do (*Byrd v. Hall,* 847 S.W.2d 208 at 212), he would not have granted the summary judgment. The following inferences can be reasonably be drawn from the evidence that Dr. Bandeian presented.

It is not surprising that Dr. Bandeian has no direct evidence to show that Dr. Wagner wrote the letter because the person who wrote the letter would not want any one to witness him committing this outrageous act. However, the evidence that Dr. Bandeian has

presented makes a strong circumstantial case that Dr. Wagner wrote the letter. It is obvious that the person who wrote the letter must have been privy to personal and professional knowledge about Dr. Bandeian. It is also obvious that the person who wrote the letter must have had a motive to write such an outrageous letter. The evidence proves that only someone who was present at Dr. Bandeian's 1994 deposition or who read the transcript of the deposition would have been privy to the personal and professional information about Dr. Bandeian that was contained in the letter. Dr. Wagner was among that small group of persons who possessed the necessary knowledge to write the letter.

There were only three persons who had the motive to write the letter: Drs. Wagner, Hester and Burns. The letter stated that prior to Dr. Bandeian operating on Mrs. Messinger, her nerve was only bruised, not cut, but that at her surgery, Dr. Bandeian intentionally cut Mrs. Messinger's nerve, so that he and Dr. Kaufman could profit from her malpractice suit. Drs. Bandeian and Kaufman were assisting Mrs. Messinger in her malpractice suit against the three defendants. The letter attempted to mislead Mrs. Messinger into thinking that her nerve was only bruised, not cut. Who else other than the three defendant's in the Messinger case would have motive to try to mislead Mrs. Messinger about whether or not her nerve was cut. The letter encourages Mrs. Messinger to drop her malpractice suit against Drs. Wagner, Hester and Burns, and instead sue Drs. Bandeian and Kaufman for battery and fraud. Who else but the three defendants in the malpractice case would have the motive to encourage Mrs. Messinger to drop her malpractice against Drs. Wagner, Hester and Burns? Who else but the three defendants would have the motive to encourage Mrs. Messinger to sue Bandeian and Kaufman for fraud and battery. It is clear that the author intended to inflict emotional distress on Mrs. Messinger. Who else but Dr. Wagner, Hester and Burns would have motive to inflict emotional distress on Mrs. Messinger. In summary, only Wagner, Hester and Burns would have motive to (1) encourage Mrs. Messinger to drop her malpractice suit, (2) encourage Mrs. Messinger to sue

Drs. Bandeian and Kaufman, and (3) to inflict emotional distress on Mrs. Messinger.

Of the three persons who had motive to write such an outrageous letter, the evidence allows a reasonable inference to be made that Dr. Wagner wrote the letter. First, it is known that he was present at Dr. Bandeian's deposition and was privy to all the personal and professional facts about Dr. Bandeian contained in the letter. Second, Dr. Wagner presented no evidence to show that Drs. Hester and Burns were also privy to the knowledge necessary to have written the letter. Third, anonymous defamatory letters were written about Dr. Anderson and the only connection between Anderson and Bandeian is Wagner. Furthermore, Dr. Anderson testified that the letter about him must have been written by a neurologist. Fourth, the style of the letters written about Dr. Anderson and Dr. Bandeian are so similar that it is reasonable to conclude that they were written by the same person. Fifth, the person who wrote the letter must have done so out of tremendous personal animosity towards Dr. Bandeian and Dr. Kaufman, and Dr. Kaufman has never seen a doctor with as much personal animosity hostility over being sued as did Dr. Wagner.

The sole issue to be considered by this Court is whether here is a genuine issue as to whether Dr. Wagner wrote the anonymous letter. Dr. Bandeian's proof is circumstantial, but in civil cases facts can be proved by circumstantial evidence. *Phillips v. Newport,* 28 Tenn.App. 187, 187 S.W.2d 965 at 971. If the evidence presented by Dr. Bandeian is believed and justifiable inferences are to be drawn in his favor, the jury must be allowed to consider and weigh Dr. Bandeian's circumstantial case against Dr. Wagner.

Dr. Wagner attempted to prove by his affidavit that he did not write the letter. However, Dr. Wagner's credibility at issue. Dr. Bandeian does not believe that the kind of person who would write such an outrageous anonymous letter would not hesitate to deny in an affidavit under oath that he did in fact write the letter. The material fact that is in dispute is whether Dr. Wagner wrote the letter. Dr. Wagner's testimony by affi-davit is an integral (and the only) part of his factual proof His credibility is at issue. The matter can't be resolved on the basis of his affidavit. A trial is necessary so that the fact finder can observe Dr. Wagner's demeanor when he testifies and determine whether or not Dr. Wagner's denial of culpability for the letter is more credible than the circumstantial evidence that he wrote the letter.

## CONCLUSION

The summary judgment should be reversed because the fact finder could reasonably conclude that the person who would write such a letter would not hesitate to deny his culpability under oath, and that Dr. Wagner wrote the letter. For this case to be properly resolved, it is necessary that the fact finder listen to Dr. Wagner deny his culpability, assess his demeanor, and weigh his testimony against the circumstantial evidence that only Dr. Wagner had the combination of motive and knowledge necessary to write the letter.

Respectfully submitted.

/s/ John J. Bandeian
    John J. Bandeian, M.D.
    3169 West State St.
    Bristol, TN 37620

### CERTIFICATE OF SERVICE

The undersigned hereby certifies that true and exact copies of the above Brief and exhibits have been served upon counsel for Martin Wagner by placing a true and exact copy of said document in the United States Mail, postage prepaid on this 12th day of May, 1997 and sending it to Ed. R. Davies, Attorney at Law, 150 Second Avenue North, Suite 225, Nashville, TN 37201.

/s/ John Bandeian
    John Bandeian, M.D.

KOCH, Judge, concurring.

I concur in the results of the court's opinion for two reasons. First, the affidavits submitted by Dr. Bandeian in response to Dr. Wagner's motion for summary judgment do not contain specific facts that would be admissible in evidence demonstrating the existence of material factual disputes or that Dr. Wagner is not entitled to a judgment as a

matter of law.[1] Second, Dr. Bandeian has not demonstrated the existence of heightened concerns for Dr. Wagner's credibility.[2]

---

1. A basic tenet of summary judgment practice is that a party faced with a properly supported motion for summary judgment must come forward with specific facts that would be admissible in evidence demonstrating that there are material factual disputes or that the moving party is not entitled to a judgment as a matter of law. *See Byrd v. Hall,* 847 S.W.2d 208, 215 (Tenn.1993); *Wadlington v. Miles, Inc.,* 922 S.W.2d 520, 522 (Tenn.Ct.App.1995); Tenn.R.Civ.P. 56.06.

2. Summary judgments should not be used to make credibility determinations. *See Byrd v. Hall,* 847 S.W.2d at 216. However, the credibility concerns that warrant denying a motion for summary judgment must rise to a level greater than the normal credibility questions that arise whenever a witness testifies. *See Hepp v. Joe B's, Inc.,* App. No. 01A01–9604–CV–00183, 1997 WL 266839, at *2 (Tenn.Ct.App. May 21, 1997) (No Tenn.R.App.P. 11 application filed).