IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
April 3, 2001 Session

## JULIE AMANDA DURBIN, ET VIR. v. SUMNER COUNTY REGIONAL HEALTH SYSTEMS, INC., ET AL.

### Appeal from the Circuit Court for Sumner County
No. 15711-C    Arthur McClellan, Judge

---

### No. M2000-02109-COA-R3-CV - Filed September 6, 2001

---

The appellants sued the appellees for claims connected with the death of the appellants' twin fetuses. The jury found in favor of the appellees, and, in addition, after the jury verdict, the trial court granted appellee Dr. Caldwell's motion to dismiss on the ground that the statute of limitations had run before he was sued. The appellants argue that this court should reverse the trial court's order dismissing Dr. Caldwell and overturn the jury's verdict. We reverse the trial court's order dismissing Dr. Caldwell, but affirm the jury verdict in his favor and in favor of the other appellee.

### Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed in Part and Reversed in Part

BEN H. CANTRELL, P.J., M.S., delivered the opinion of the court, in which WILLIAM B. CAIN, J. and J. S. DANIEL, SP. J., joined.

Gary K. Smith and Sherry S. Fernandez, Memphis, Tennessee, for the appellants, Julie Amanda Durbin and James M. Durbin.

Robert L. Trentham and G. Brian Jackson, Nashville, Tennessee, for the appellee, Sumner County Regional Health Systems, Inc.

Phillip North, Michael F. Jameson, and Tom Shumate, Nashville, Tennessee, for the appellee, William R. Caldwell, M.D.

### OPINION

### I.

Appellant, Julie Amanda Durbin, was pregnant with twins in 1995. On July 20, 1995, in the twenty-ninth week of her pregnancy, Mrs. Durbin came to the Sumner Regional Medical Center (the

"Hospital") complaining of a backache and irregular contractions. After being tested with a fetal monitor, she was discharged and sent home.

On July 22, 1995 at 1:00 a.m., Mrs. Durbin again arrived at the Hospital complaining of back pain, abdominal pain and regular contractions. The Hospital admitted her for obstetric emergency out-patient observation. She was again hooked up to a fetal heart monitor. The nurses monitored the fetal heartbeats and did not report any evidence of distress to Dr. Caldwell, Mrs. Durbin's physician. However, because of his concern over Mrs. Durbin's back pain, Dr. Caldwell admitted her to the postpartum unit and ordered routine checking of the fetal heartbeats.

Dr. Caldwell suspected that her back pain might be due to kidney stones. He ordered a renal ultrasound. During this ultrasound, Mrs. Durbin asked the technician if she could look at the twins to ascertain their sex. The ultrasound showed that there were no kidney stones present, but there were other complications with the tubes leading from her kidneys to her bladder, the ureters, and Dr. Caldwell concluded that could be the cause of her back pain. She was given medication for her pain, and discharged from the Hospital. Her instructions upon discharge included that she was put on bed rest with bathroom privileges.

On July 26, 1995, Mrs. Durbin had a scheduled appointment with Dr. Caldwell. After being unable to find a fetal heartbeat, Dr. Caldwell checked Mrs. Durbin with an ultrasound. The ultrasound confirmed that the twins were dead. The doctor also noticed an extraordinarily large pocket of fluid. He believed that the twins had died as a result of a placental abruption due to the large amount of fluid. Dr. Caldwell delivered the twins the next day. When Mrs. Durbin returned for her six-week follow-up visit on September 11, Dr. Caldwell told her that the twins had instead died as a result of Twin to Twin Transfusion Syndrome ("TTS").

The twins shared one placenta, but each twin had their own amniotic sac. When twin fetuses share a placenta they are susceptible to TTS. TTS occurs when blood passes disproportionately from one fetus to the other through connecting blood vessels within the shared placenta. One fetus gets too much blood, which overloads the cardiovascular system, and may cause heart failure. The other fetus does not get enough blood and may die from anemia. The fetus that receives the extra blood urinates more, therefore, increasing the fluid in the amniotic sac. TTS can trigger symptoms in the mother such as pain, pre-term labor, and abdominal distension.

On July 12, 1996, the appellants filed suit against the Hospital and several individual nurses. Dr. Caldwell was not included as a defendant with the initial filing. The Hospital reserved the right to rely on comparative fault when it filed its answers, and subsequent amended answers. The appellants and the Hospital deposed Dr. Caldwell on July 28, 1997. On December 4, 1997, the Hospital amended its answer to "invoke the defense of comparative fault" citing the actions of Dr. Caldwell. This motion was granted by agreed order. On February 11, 1998, appellants moved to name Dr. Caldwell as a party to their complaint. Dr. Caldwell filed an answer which denied the allegations included in the amended complaint, and also argued that the appellants' amendment adding him as a party was time-barred. On June 4, 1999, Dr. Caldwell moved to dismiss the

appellants' action against him because it was barred by the statute of limitations. The motion was continued indefinitely due to the death of the trial judge. On March 22, 2000, the appellants and the Hospital opposed Dr. Caldwell's motion to dismiss. The trial judge heard the motion on April 4, 2000, and reserved the right to issue a ruling after the hearing of the proof at trial. The Hospital and Dr. Caldwell both filed motions in limine to exclude evidence on several issues. At the pretrial conference held April 14, 2000, the appellants dismissed their claims against the individual nurses. The trial began April 18, 2000. The trial court granted both the Hospital's and Dr. Caldwell's motions in limine. On May 2, 2000, the jury returned a verdict in favor of the Hospital and Dr. Caldwell. The trial court then held that the appellants' claims against Dr. Caldwell were barred by the statute of limitations and entered an order to that effect on May 15, 2000. The appellants filed a motion for judgment notwithstanding the verdict and new trial on May 25, 2000. The Hospital and Dr. Caldwell filed motions for discretionary costs. The trial court denied the appellants' motion and granted the Hospital and Dr. Caldwell discretionary costs.

## II.
### DR. CALDWELL'S MOTION TO DISMISS

The appellants challenge the trial court's post-trial dismissal of Dr. Caldwell.

Because the notice of appeal did not specify the May 15, 2000 order, Dr. Caldwell first argues that appellants failed to timely appeal from the trial court's order granting the motion to dismiss. The appellants did, however, include the granting of the motion to dismiss in their motion for a new trial. Therefore, the issue was preserved. The trial court filed an order denying the appellants' motion for a new trial on July 27, 2000. This order is the beginning of the time for the appellants to file their appeal. The appellants' notice of appeal on August 17, 2000 was within the thirty day time limit. Therefore, we hold that the appeal includes the order dismissing Dr. Caldwell on statute of limitations grounds.

Turning to the merits of this issue, we note initially that there has been some confusion in the briefs submitted as to whether the motion should have been treated as a motion for summary judgment or a motion to dismiss. A motion to dismiss under Tenn. R. Civ. P. 12.02(6), failure to state a claim upon which relief can be granted, is converted to a motion for summary judgment if the trial judge considers matters outside the pleadings. Tenn. R. Civ. P. 12.02. This motion to dismiss is based on the expiration of the statute of limitations, Tenn. R. Civ. P. 8.03. The motion has not been converted to a motion for summary judgment, and we address it as a motion to dismiss.

The trial court stated "Based upon the record as a whole, the Court finds that there is no genuine issue of material fact as to whether the applicable statute of limitations Tenn. Code Ann. § 29-26-116 has run. The Court holds that it has run prior to Dr. Caldwell being named as a party to this suit." The trial court based this decision on several factors: (1) the cause of action accrued in July or September of 1995 and Dr. Caldwell was not sued until February 11, 1998; (2) the statute of limitations for medical malpractice is one year, Tenn. Code Ann. § 29-26-116(a)(1); and (3) Tenn. Code Ann. § 20-1-119, which in some cases allows a new defendant to be added after the statute of

limitations has run does not apply when the plaintiff was aware of the potential liability of the new defendant.

The appellants argue on appeal that there is an exception to the one year statute of limitations that applies in their case. They rely on Tenn. Code Ann. § 29-26-116(3), which states that the statute of limitations will not apply if there is "fraudulent concealment on the part of the defendant."

The appellants specifically argue that Dr. Caldwell fraudulently concealed the timing of the fetal monitoring strips. They allege that Dr. Caldwell stated in an interview prior to the filing of their initial complaint and his deposition that the fetal monitoring strip on July 22, 1995 was taken after he examined Mrs. Durbin and he would not know the results of the strip unless the nurses called him. The appellants relied upon this contention when they did not include Dr. Caldwell in their initial or amended complaint filed in July and November of 1996, respectively.

Dr. Caldwell replies to the fraudulent concealment issue by pointing out that the appellants did not plead the issue in the court below. *See City State Bank v. Dean Witter Reynolds, Inc.*, 948 S.W.2d 729 (Tenn. Ct. App. 1996). We agree that they did not raise the statutory exception to the one year statute of limitations in any of their pleadings, but they did raise the issue in their various responses to Dr. Caldwell's motion to dismiss, and the trial judge considered the claim before granting the motion. We will therefore consider it here.

The trial judge found as a fact that the appellants were not misled by Dr. Caldwell and that they had all the necessary facts by September 1995 to determine Dr. Caldwell's involvement, if any. Our review of these findings is de novo on the record accompanied by a presumption of correctness unless the evidence preponderates against the findings. Tenn. R. App. P. 13(d). We have reviewed the evidence on which the appellants rely and we concur in the trial judge's findings. Therefore, the statute of limitations was not extended by Dr. Caldwell's concealment.

The appellants then argue that Tenn. Code Ann. § 20-1-119 applies to their situation. Tenn. Code Ann. § 20-1-119 allows plaintiffs to amend their complaint within ninety days of a defendant's answer or amended answer that alleges a third party caused or contributed to the plaintiff's injury even if the statute of limitations has run. Tenn. Code Ann. § 20-1-119(a)(1) provides:

> (a) In civil actions where comparative fault is or becomes an issue, if a defendant named in an original complaint initiating a suit filed within the applicable statute of limitations, or named in an amended complaint filed within the applicable statute of limitations, alleges in an answer or amended answer to the original or amended complaint that a person not a party to the suit caused or contributed to the injury or damage for which the plaintiff seeks recovery, and if the plaintiff's cause or causes of action against such person would be barred by any applicable statute of limitations but for the operation of this section, the plaintiff may, within ninety (90) days of the filing of the first answer or first amended answer alleging such person's fault, either:

> (1) Amend the complaint to add such person as a defendant pursuant to Rule
> 15 of the Tennessee Rules of Civil Procedure and cause process to be issued for that
> person;

This is the procedure the appellants relied upon in their motion to amend complaint to include Dr. Caldwell as a defendant without regard to the statute of limitations.

The trial court based its order with regard to the application of Tenn. Code Ann. § 20-1-119 on *Wittlesey v. Cole*, 142 F.3d 340 (6th Cir. 1998) and *Lipscomb v. Doe*, No. 02A01-9711-CV-00293, 1998 WL 886601 (Tenn. Ct. App. 1998), *rev'd on other grounds*, 32 S.W.2d 840 (Tenn. 2000). The court stated, "TENN. CODE ANN. § 20-1-119 is not applicable to this case because clearly plaintiffs knew or should have known that Dr. Caldwell may have been at fault many months and perhaps years prior to the Hospital's amended answer."

The interpretations between two sections of this court differ as to whether this statute applies to all third parties who are named in a defendant's answer or amended answer or solely to unknown or "phantom" third parties. A panel of the middle section of this court in *Townes v. Sunbeam Oster Co., Inc.*, No. M1997-00245-COA-R3-CV, 2001 WL 92057 (Tenn. Ct. App. 2001) held that it would not follow the analysis of *Wittlesey* and *Lipscomb* in its interpretation of Tenn. Code Ann. § 20-1-119. This panel held that Tenn. Code Ann. § 20-1-119(a) applies to *any* third party named in an answer or amended answer, not just to heretofore unknown parties. *Townes*, 2001 WL 92057, *4-5. Therefore, we will follow this precedent.

Following the interpretation of this court in *Townes*, the appellants would be able to file an amended complaint including Dr. Caldwell within ninety days of the Hospital's filing of its amended answer. The fact that the appellants knew of Dr. Caldwell's potential liability does not nullify the application of Tenn. Code Ann. § 20-1-119(a).

The appellants filed a motion to amend the complaint on February 11, 1998 to add Dr. Caldwell as a defendant which was granted the same day. The appellants' filed their Second Amended Complaint on February 13, 1998. This complaint was clearly filed within ninety days of the order granting Hospital's motion to amend its answer. Therefore, the suit against Dr. Caldwell was timely.

The appellants also argue that they should be able to rely on Tenn. R. Civ. P. 15.03, The Relation Back of Amendments, to amend their complaint. Because we have found that their action is saved from the statute of limitations by Tenn. Code Ann. § 20-1-119, we do not need to address this issue.

For this reason, we reverse the post-trial order dismissing Dr. Caldwell on statute of limitations grounds.

# III.
## JURY VERDICT

The case went to the jury and the jury returned a verdict in favor of the defendants. The appellants assert that the verdict is contrary to the weight of the evidence. Our role in an appeal from a jury verdict does not allow us to reweigh the evidence or consider where the preponderance lies. Instead, we must determine whether there is any material evidence to support the verdict. If there is, we must affirm it. *See Reynolds v. Ozark Motor Lines, Inc.*, 887 S.W.2d 822, 823 (Tenn.1994); *Pullen v. Textron, Inc.*, 845 S.W.2d 777, 780 (Tenn. Ct. App.1992). We are required to take the strongest legitimate view of the evidence in favor of the verdict, assume the truth of the evidence in support thereof, allow all reasonable inferences to sustain the verdict and disregard all to the contrary. *Hobson v. First State Bank*, 777 S.W.2d 24 (Tenn. Ct. App.1989).

This trial lasted for two weeks. The jury heard the evidence and determined that neither the Hospital nor Dr. Caldwell were at fault for the death of the twins or the injuries to the appellants. After reviewing the evidence, we find that there is ample material evidence to support the jury's verdict.

Dr. Caldwell testified that Ms. Durbin arrived at the Hospital on both July 20 and July 22 complaining of back pain and having contractions. On July 20, he ordered medication to stop her contractions. The nurse informed Dr. Caldwell that the contractions had stopped, and Ms. Durbin was sent home. Her back pain lessened after the contractions stopped, and Dr. Caldwell assumed they were the cause of her back pain. When she came to the Hospital on July 22, the doctor ordered an ultrasound to see if she was having a problem with her kidneys. The ultrasound revealed that she was indeed having a problem with her ureter on the side where she complained about the back pain. Dr. Caldwell determined that this was the cause of her back pain. Ms. Durbin was also put on the fetal heart monitor. The nurses testified that they did not find any evidence of distress, so they did not call Dr. Caldwell. Ms. Durbin was then discharged with instructions for bed rest and to call about any complications. There was testimony that Ms. Durbin did not call to report any problems except for nausea. Ms. Durbin testified that she never filled the prescription for medicine prescribed for her nausea. The expert witnesses of both appellees testified that all these actions were within the standard of care.

The jury also heard testimony from Dr. Caldwell and two expert witnesses for the appellees, Dr. Stephen Fortunato and Dr. Joseph P. Bruner, that the TTS could have developed in the time period between Ms. Durbin's discharge on July 22 and her visit to Dr. Caldwell on July 26. Both of appellees' expert witnesses testified extensively to the occurrence of acute TTS. They both testified from their personal experiences that the amount of fluid found in this case could be produced in less than four days, maybe even within twenty-four hours.

From the evidence presented the jury could have come to several conclusions that would require them to render a verdict in favor of the appellees. The jury could have concluded that TTS had not occurred when Ms. Durbin came to the Hospital on July 22. They could have concluded that

it occurred in the days between July 22 and July 26.  The jury could have concluded that the TTS may have been present, but that Dr. Caldwell and the Hospital all acted within the standard of care in the treatment of Mrs. Durbin.

As we have stated above, our role is not to reweigh the evidence.  Because we have found ample evidence to support the jury's decision, we cannot overturn the verdict.

**IV.**

Since the jury returned a verdict for the defendants and we have determined that there is material evidence to support it, the appellants must show that something went wrong at the trial or leading up to the trial that prevented them from getting a fair hearing.  They have raised several issues that they claim did amount to such prejudice.  When the appellants first filed their complaint, they did not include Dr. Caldwell as a defendant.

**A. REFERENCE TO THE HOSPITAL'S AMENDED ANSWER**

On October 15, 1997, the Hospital filed its amended answer regarding comparative fault. On December 1, 1997, the Hospital filed a motion further amending its answer to point the finger at Dr. Caldwell.  This amendment read as follows:

32(a)   The plaintiff and her twin fetuses were under the care and treatment of William Caldwell, M.D.  In the event that a jury determines that the plaintiff's alleged injuries were the result of negligence, these defendants aver that the acts and omissions of Dr. Caldwell, in violation of the recognized standard of acceptable professional practice, caused or contributed to the plaintiff's injuries.  Specifically, these defendants aver that Dr. Caldwell may be found to have been negligent for:

(1)   Failing to monitor Ms. Durbin with sufficient frequency between May 30 and June 28, 1995;

(2)   Failing to refer Ms. Durbin to an obstetrician specializing in high-risk monochromatic twin pregnancies; and

(3)   Failing to order continuous external fetal monitoring for Ms. Durbin by a trained labor and delivery nurse and by failing to ascertain fetal well-being prior to discharging Ms. Durbin from the Hospital on July 22,1995;

(4)   Failing to order an ultrasound, biophysical profile and a repeated non-stress test or a contraction stress test with Pitocin within 24 hours of the July 22 fetal monitoring strip, which did not document reactivity of the fetus.

These defendants deny that any act or omission on their own part, or any act or omission of Dr. Caldwell, caused the plaintiffs to suffer any injury they otherwise would not have suffered. However, in the event a jury concludes otherwise, these defendants invoke the defense of comparative fault.

Immediately before trial, the trial court granted the Hospital's motion to withdraw this defense without objection from the appellants. At trial, the appellants attempted to question the Hospital's expert witness, Dr. Bruner, regarding this amended answer. The appellant wished to prove at trial that the Hospital believed that Dr. Caldwell was at fault. The trial court denied the appellants' request because, in the court's opinion, the probative value of the questions did not outweigh the adverse affect. Tenn. R. Evid. 403. The trial court did state that the appellants could ask Dr. Bruner questions regarding the same issue as to Dr. Caldwell's culpability, but that the amended answer could not be brought into the examination.

We agree with the trial court – and for an additional reason. Allegations in pleadings may be introduced but only as admissions against the pleader. *Pankow v. Mitchell*, 737 S.W.2d 293 (Tenn. Ct. App. 1987); *Goodman v. Balthrop Construction Co.*, 626 S.W.2d 21 (Tenn. Ct. App. 1981). In this case, the plaintiffs sought to use the allegations in the amended answer against Dr. Caldwell and to cross-examine Dr. Bruner about his belief that Dr. Caldwell was partially at fault. Neither the hospital nor Dr. Bruner can admit liability on the part of Dr. Caldwell. Therefore, the amended answer was not admissible.

## B. DR. STUBER'S DEPOSITION

Appellants also contend that the trial court erred when it did not allow them to use the deposition of Dr. Caldwell's proposed expert witness, Dr. Harry L. Stuber, in their examinations of appellees' expert witnesses Dr. Bruner and Dr. Fortunato. When Dr. Caldwell submitted his Rule 26 disclosures on May 20, 1999, he included as expert witnesses, Dr. Stuber and Dr. Fortunato. The Rule 26 disclosure included a summary as to what Dr. Stuber would testify to at trial. The appellants then deposed Dr. Stuber on April 5, 2000, about two weeks before trial. At this deposition, Dr. Stuber's testimony was not consistent with the Rule 26 disclosure. On April 7, 2000, Dr. Caldwell sent certified copies of a Revised Rule 26 Disclosure to the court and counsel involved in the litigation. This Revised Rule 26 Disclosure only included Dr. Fortunato as an expert witness for Dr. Caldwell. In the cover letter, Dr. Caldwell specifically stated that Dr. Stuber was no longer going to be called as a witness at trial, but rather had been re-designated as a consulting expert. At trial, Dr. Caldwell filed a motion in limine to prevent the appellants from using Dr. Stuber's deposition at trial.

The appellants state in their brief that they should have been allowed to use Dr. Stuber's deposition in their cross-examination of Dr. Caldwell and the appellees' expert witnesses, Dr. Bruner and Dr. Fortunato. The use of expert depositions in the cross-examination of the other party's experts has been allowed when the expert on the stand has "read and considered" the deposition of the other expert. *Steele v. Fort Sanders Anesthesia Group, P.C.*, 897 S.W.2d 270, 278-79 (Tenn.

Ct. App. 1994). We based this decision on the fact that the expert witness had based his conclusions on all the material he had been given, which included the other expert's deposition. This is not the situation in the present case. Neither Dr. Bruner nor Dr. Fortunato had read the deposition of Dr. Stuber before trial.

Tennessee Rule of Civil Procedure Rule 32.01(3) states that depositions may be used at trial for any purpose if the court finds that certain criteria are met. However, the final sentence of Rule 32.01(3) states that "depositions of experts . . . may not be used at the trial except to impeach" the deponent. The Advisory Commission Comment states that this rule applies only to discovery depositions of an adversary's expert. Tenn. R. Civ. P. 32.01, Advisory Commission Comment to 1986 Amendment; *see also*, *White v. Vanderbilt*, 21 S.W.3d 215, 226 (Tenn. Ct. App. 1999). Dr. Stuber's deposition was a discovery deposition taken by the appellants' attorney. Therefore, the only use of Dr. Stuber's deposition can be to impeach his own testimony.

Therefore, under the current rules and case law, Dr. Stuber's deposition should not have been used to cross-examine either Dr. Caldwell or the expert witnesses.

### C. DR. CALDWELL'S MOTION IN LIMINE EXCLUDING DR. SHAVER'S TESTIMONY

When Mrs. Durbin came in for an appointment on July 26, 1997, Dr. Caldwell discovered that the twins were dead. He then told the appellants that Mrs. Durbin had suffered a placental abruption. He delivered the twins the next day. When Mrs. Durbin returned for her six-week follow-up visit, Dr. Caldwell informed her that the twins had died from TTS.

Prior to trial, appellants filed an expert disclosure from their expert witness, Dr. Shaver, stating that Dr. Shaver intended to testify that Dr. Caldwell deviated from the standard of care when he diagnosed a placental abruption upon the death of the twins. Dr. Caldwell filed a motion in limine prior to trial to prevent this testimony. The trial court granted the motion because it was not relevant to the issues raised for the court's consideration.

The appellants argue that this testimony should have been allowed at trial to prove that Dr. Caldwell deviated from the standard of care because he failed to diagnose the hydramnios on July 26 and instead diagnosed the problem as placental abruption. In addition, Dr. Caldwell sent Mrs. Durbin home with what he thought was placental abruption, which according to the appellants, was a potentially life-threatening condition. The appellants state that this further shows a deviation from the standard of care. Appellants also assert that Dr. Caldwell's "deviation is so stark as to suggest Dr. Caldwell knew there was a mishandling of TTS and deflected attention from the issue long enough to investigate what needed to be said to defend the case."

Appellants did not include the misdiagnosis after the babies' deaths as a negligent act by Dr. Caldwell in their Second Amended Complaint. Even though the appellants alleged the infliction of emotional distress, there is no statement in the expert disclosure that states this misdiagnosis on July 26 caused emotional distress. Therefore, evidence of the misdiagnosis is outside the scope of the

appellants' complaint.  In addition, the doctor's misdiagnosis after the death of the twins is not relevant to Dr. Caldwell's care of Mrs. Durbin's pregnancy.  Evidence is relevant if it "ha[s] any tendency to make the existence of any fact that is of consequence to the determination of the action more probably or less probable than it would be without the evidence."  Tenn. R. Evid. 401.

We also note that appellants' conjecture that Dr. Caldwell purposefully misdiagnosed Mrs. Durbin's condition to "buy himself more time" is completely without support in the record.  This unsupported allegation does not make this testimony suddenly relevant.

### D.  TESTIMONY REGARDING DR. CALDWELL'S CARE OF ANOTHER SET OF TWINS

At trial, Mrs. Durbin attempted to testify regarding another set of twins that Dr. Caldwell delivered after the delivery of her twins.  She stated that Dr. Caldwell had a conversation with her concerning that delivery.  At that point, Dr. Caldwell objected to the testimony.  The trial court responded to the objection by stating that the appellants needed to lay the foundation as to the relevance of the other set of twins to the issues at trial.  Mrs. Durbin again testified that she had a conversation with Dr. Caldwell, and he told her that he had delivered a set of twins who lived.  Dr. Caldwell objected again.  The appellants' attorney, Ms. Fernandez, responded that she was trying to lay a foundation for a later action.  She then stated that she would move directly to that action.

The appellants now argue that the trial court should have allowed Mrs. Durbin's testimony regarding the other set of twins.  The trial court gave appellants the opportunity to lay a foundation in order to bring in the testimony, but appellants chose not to do so.  Appellants clearly did not make an offer of proof regarding this testimony and moved on with their direct examination of Mrs. Durbin.  Relief shall not be granted "to a party responsible for an error or who failed to take whatever action was reasonably available to prevent or nullify the harmful effect of an error."  Tenn. R. App. P. 36(a).  Clearly, the appellants were given ample opportunity by the trial court to introduce the testimony.  Because they did not attempt to lay a foundation, the testimony was not relevant.

### E.  PECUNIARY VALUE OF THE LIVES OF THE TWINS

The appellants argue that the trial court erred when it did not allow them to enter evidence of their earnings history, present earnings, future earnings and future education of the appellants, as well as their plans, hopes and dreams for the twins.  The appellants state in their argument to this court that such evidence "has historically formed the basis for a calculation of the pecuniary value of the life of a minor . . . ."  They cite no authority for this proposition.  The cases concerning pecuniary value of the life of a minor state that the pecuniary value should "be measured by the experience and judgment of the jury, enlightened by a knowledge of the *age, sex and physical and mental characteristics of the child.*"  *Strother v. Lane*, 554 S.W.2d 631, 636 (Tenn. Ct. App. 1976); *Crowe v. Provost*, 52 Tenn. App. 397, 417, 374 S.W.2d 645, 654 (Tenn. Ct. App. 1963) (emphasis added).  The trial court's ruling excluding the parents' earnings past, present and future, as well as their hopes, dreams and plans for the twins, was proper.

## F. APPELLEES' MOTIONS IN LIMINE

### 1. EMOTIONAL DISTRESS, MENTAL AND EMOTIONAL DAMAGES AND LOSS OF CONSORTIUM

Appellants, Julie and James Durbin, sued the appellees for negligent infliction of emotional distress and loss of consortium. James Durbin, alone, also sued for mental and emotional distress; and Julie Durbin, alone, sued for personal injury and the resulting pain and suffering and mental and emotional distress.

Before trial, appellees each filed various motions in limine. The Hospital filed a motion in limine "to exclude any and all evidence of the plaintiffs' alleged emotional injuries." Dr. Caldwell filed a motion in limine "to exclude Plaintiffs' allegations of intentional and/or negligent infliction of emotional distress and all related evidence . . . ." The trial court then filed an order on April 20, 2000 granting Dr. Caldwell's motion. On April 24, 2000, the trial court granted the Hospital's motion following an offer of proof. In addition, at the end of the appellants' proof, the Hospital moved for a directed verdict as to the claims for negligent infliction of emotional distress. The trial court dismissed these claims with prejudice on the grounds that the appellants had failed to establish a cause of action by competent proof.

Our supreme court set out the standards for proof of negligent infliction of emotional distress in *Camper v. Minor*, 915 S.W.2d 437 (Tenn. 1996). One of the requirements to prove this cause of action is the presentation of expert medical or scientific proof to support the injury claim. *Camper,* 915 S.W.2d at 446. The appellants did not present any expert medical or scientific proof of their emotional injury at any time before or during the trial. Therefore, since the plaintiffs had not designated any experts to verify their claims of emotional distress, the trial judge acted properly in granting the motions in limine and in dismissing the claims against the hospital at the trial.

The appellants argue Julie Durbin's emotional distress claim does not require expert medical or scientific proof, because she alleged she was physically injured. The court in *Camper* specifically stated, "we conclude that the [physical manifestation or injury] rule shall no longer be used to test the validity of a prima facie case of negligent infliction of emotional distress." *Id.* Therefore, the court abolished the physical injury rule as a limiting factor in a claim for emotional distress, and we do not think the presence of a physical injury dispenses with the requirement of expert proof to establish the claim.

The appellees also filed motions in limine to exclude appellants' evidence for their loss of consortium claims. The trial court granted the motions and based its decision on the belief that *Jordan v. Baptist Three Rivers Hospital*, 984 S.W.2d 593 (Tenn. 1999), should not be applied retroactively.

The *Jordan* case allowed for consortium damages in connection with a wrongful death claim. Immediately after *Jordan*, this court declined to retroactively apply *Jordan* absent the supreme

court's intent to do so. *E.g., McCracken v. City of Millington*, No. 02A01-9707-CV-00165, 1999 WL 142391, \*14-17 (Tenn. Ct. App. 1999); *Hill v. City of Germantown,* No. 02A01-9803-CV-00078, 1999 WL 142386, \*8-11 (Tenn. Ct. App. 1999). The supreme court later decided that *Jordan* should indeed be applied retroactively. *Hill v. City of Germantown*, 31 S.W.3d 234 (Tenn. 2000). The supreme court stated: We hold that *Jordan* applies retroactively to: (1) all cases tried or retried after the date of our decision in *Jordan*; and (2) to all cases pending on appeal in which the issue decided in *Jordan* was raised at an appropriate time. *Hill*, 31 S.W.3d at 240.

This trial was held in April of 2000. Therefore, the *Jordan* decision should have been applied in this case. The trial court erred in not applying *Jordan* in its decision. However, we think this error was harmless. This issue goes to the question of damages, and the jury was instructed not to consider damage issues until finding one or both of the appellees liable. Because the jury found for the appellees, the issue of damages would not have been considered in the deliberations.

### 2. PHOTOGRAPHS OF APPELLANTS HOLDING THE TWINS

One of the motions in limine filed by the appellees concerned the admissibility of three photographs of the twins and the appellants after the twins were delivered. After arguments on the issue the trial court found that the "prejudicial impact of the photographs outweigh[ed] the probative value . . . ." The trial court based this ruling on Tennessee Rules of Evidence Rule 403.

In a recent case concerning the admissibility of evidence under Rule 403, this court has stated:

> The admissibility of evidence is a matter which rests within the sound discretion of the trial court. *State v. Ballard*, 855 S.W.2d 557, 562 (Tenn.1993); *State v. Williams*, 657 S.W.2d 405, 411-12 (Tenn.1983); *Murray v. State*, 214 Tenn. 51, 377 S.W.2d 918, 920 (1964); *Wright v. Quillen*, 909 S.W.2d 804, 809 (Tenn.App.1995); *State v. Rhoden*, 739 S.W.2d 6, 13 (Tenn.Crim.App.1987). This Court will not interfere with the trial court's exercise of its discretion absent clear abuse. *Williams*, 657 S.W.2d at 411-12; *Murray v. State*, 377 S.W.2d at 920; *Rhoden*, 739 S.W.2d at 13.

*Roy v. Diamond*, 16 S.W.3d 783, 791 (Tenn. Ct. App. 1999).

We do not find that the trial court abused its discretion in excluding the photographs. The appellants wished to enter the photographs to prove that the twins died at different times. The appellants also wished to enter the photographs to counteract the appellees characterization of the twins as "fetuses." They wanted to show that the twins were "small, human babies." The appellants also argue that the photographs show that the appellants were already involved in the lives of the twins.

While the photographs are relevant as to the condition of the twins, we believe that the appellants' expert witness testimony was more reliable as to the difference in times of death of the twins. We do not believe that a lay person could make a conclusion as to the time difference from viewing the photographs. The appellants' expert witness did not even rely on the photographs as basis for his testimony. We therefore believe that the probative value of the photographs is limited and the other evidence presented by the appellants' expert witness was more probative evidence on the same question. The use of the photographs for the other two stated reasons would clearly have an emotional impact on the jurors viewing the photographs.

Because the admission of the photographs would be more prejudicial than probative, we find that the trial court correctly excluded the photographs.

### G. TRIAL COURT'S COMMENTS ON THE CHARGE

The appellants argue that the trial court made impermissible comments when it was reading the jury instructions to the jury. The language in question is as follows:

> As nurses, the employer, Sumner Regional Medical Center is responsible for the nurses' negligence. In addition, you may also conclude that fault with or against Sumner Regional Medical Center if you find that Sumner Regional Medical Center was at fault separate and apart from the fault of the nurses.

> *       *       *

> Ladies and Gentleman [sic], what Mr. Trentham was properly pointing out in reading the jury charge, one of the charges I read was with regards to– I won't repeat the deleted term but it's actually an agency relationship. And what I read was that Sumner County– or Regional Medical Center, as an employer, is responsible for the employee's negligence. What I should have done is stop right there because in this case there is no independent evidence that the Hospital did any negligence of its own apart from the actions of the agents, i.e., the nurses.

> But, disregard that next sentence that I read which said, "In addition, you may also attribute fault directly against the Hospital if your find that the Hospital was at fault apart and separate from the fault of the nurses." The Hospital did nothing. There's no evidence the Hospital did anything so just simply disregard that second sentence of that charge.

> Do y'all understand? Okay, there's one no-head shaking. All right. We've been here for two weeks listening to proof. All the proof against the Hospital is that the nurses did things wrong. If you give it its best shot, if you give it – there's no evidence independent of the nurses that the Hospital itself did anything wrong. The instructions I read had a sentence in it that said, "In addition, you could consider the

-13-

independent negligence of the Hospital." And, I'm telling you the Hospital didn't do anything independent of their nurses. If you find the nurses did something wrong, then there are other jury instructions where it's a vicarious liability they would be responsible for the negligence of their nurses. But, disregard the instruction that said that the Hospital itself was negligent. Okay?

The appellant argues that this excerpt unduly influenced the jury in their deliberations with five statements that the Hospital was not negligent.

We disagree. The trial court was merely correcting a mistake made in reading the instructions to the jury. The trial court adequately explained the difference between the Hospital being negligent and the Hospital being held liable because of the nurses, negligence. We believe that the jury could easily understand the judge's comments. In addition, there was no evidence at trial of the Hospital's negligence, independent of the nurses. Therefore, the trial court did not make any impermissible comments on a question presented to the jury.

In *Grandstaff v. Hawks*, 36 S.W.3d 482 (Tenn. Ct. App. 2000), we stated "we should not set aside a jury's verdict because of an erroneous instruction unless it affirmatively appears that the erroneous instruction actually misled the jury. *Id.* at 497 (citing *Carney v. Coca-Cola Bottling Works*, 856 S.W.2d 147, 150 (Tenn. Ct. App. 1993) and *Helms v. Weaver*, 770 S.W.2d 552, 553 (Tenn. Ct. App. 1989)). We do not believe that the trial court's mistake misled the jury. The trial court made every effort to clearly explain the instruction.

## H. JURY CHARGE

The appellants argue on appeal that the trial court erred on several occasions when charging the jury. For a judgment to be overturned on appeal based on the jury instructions, the instruction must be shown to have more likely than not affected the outcome. Tenn. R. App. P. 36(b). When reviewed on appeal, jury instructions are considered as a whole when determining whether the trial court erred in the instructions. *Estate of Elam v. Oakley*, 738 S.W.2d 169, 174 (Tenn. 1987). Even if a portion of the jury instruction is objectionable, if the trial court explains it and corrects it in other parts of the jury charge so that the instructions as a whole are not misleading, then the jury instructions will not be considered prejudicial. *Id.*

### 1. COMPARATIVE FAULT

The appellants first argue that the trial court erred in its instruction of Tennessee Pattern Instructions 3- Civil 3.50 (hereinafter "T.P.I. 3-Civil") This instruction is the instruction on comparative fault. The appellants argue that the trial court erred when it did not substitute the word "defendants" for the word "party." The appellants argue that the instruction indicated that the appellants themselves were to blame for some part of the fault.

In other parts of the instructions, the trial court clearly stated that the jury was to consider the liability of only the appellees "In deciding this case, you must determine the fault of each of the defendants." The instructions as a whole are not misleading so that the jury would consider any potential fault of the appellants. In addition, the verdict form did not contain a space for the fault of the appellants. Therefore, this mistake in the jury instruction is not a basis for overturning the verdict. *See Estate of Elam*, 738 S.W.2d at 174.

## 2. DUTY TO FOLLOW INSTRUCTIONS

The appellants then argue that the trial court erred in its instruction of T.P.I. 3- Civil 6.21 which concerns a patient's duty to follow instructions. The appellants argue that there was error because there was no evidence presented by the appellees that Mrs. Durbin's failure to follow instructions caused her injury. The appellants argue that the inclusion of this instruction implied that the appellants were at fault.

Once again, the trial court made clear in other parts of the jury instruction that the fault of only the appellees was to be considered. When looking at the jury instructions as a whole, the trial court did not mislead the jury into considering the fault of the appellants.

## 3. ADVERSE INFERENCE

The appellants also argue that the trial court erred in denying their request for a jury instruction on adverse inference because of the Hospital's failure to produce the electronic fetal monitoring strip generated on July 20, 1995. After an electronic fetal monitoring strip has been generated on a patient the Hospital procedure testified to at trial is that the strip is reviewed by the attending physician and then placed in a banker's box with other strips generated on other patients. In this case, the Hospital was unable to locate the strip generated on July 20, 1995. The appellants argued at trial that the trial court should have instructed the jury that they could infer that the monitoring strip would show that both twins were in distress.

The appellants submitted a modified version of T.P.I. 3- Civil 2.04 Absence of Witness or Evidence that specifically addressed the missing July 20, 1995 fetal monitoring strip. This instruction allows the jury to determine that a party's failure to supply certain pieces of evidence cast a negative reflection on their potential liability. The trial court denied both the modified instruction and the pattern instruction. The reasons as stated in the record are because July 22 was the pivotal day not July 20. The trial judge went on to state that he did not believe, "the absence of the monitoring strip rises to the level that a Jury can infer wrongdoing or there should be a presumption."

This court recently addressed this issue in *Richardson v. Miller*, 44 S.W.3d 1 (Tenn. Ct. App. 2000). In *Richardson*, a prenatal patient was put on an infusion pump to deliver medication to stop her contractions. The medicine delivered by the infusion pump caused the patient to suffer a heart attack. The patient later sued both the doctor and the supplier of the pump alleging that their negligence had caused her heart attack. Before being put on the infusion pump, the supplier of the

pump sent a nurse to assess the patient's condition by reviewing medical records and speaking with the patient. This nurse was to determine whether the patient met the preconditions for the use of the pump. After this session, the supplier's nurse instructed both the patient and nursing staff on the use of the pump. The missing document in *Richardson*, was the nursing assessment form in which the supplier's nurse should have recorded her findings. The document was not produced and allegedly had been lost in transit from the nurse to the company.

In *Richardson*, this court stated, "In Tennessee, as in other jurisdictions, a party's failure to produce a document capable of shedding light on a material contested issue can give rise to a permissive inference that the missing document would have been unfavorable to the party possessing it." *Richardson v. Miller*, 44 S.W.3d 1, 27-28 (Tenn. Ct. App. 2000) (citing Tennessee Law of Evidence § 401.9, at 99). Clearly, the nurses assessment of the patient's medical condition "shed[s] light on a material contested issue" in *Richardson*.

However, the missing fetal monitor strip is not as closely connected with the material issues in this case. As the trial court stated the important date according to the parties in this case was July 22 not July 20. The appellants definitely thought this was the case. Their Complaint references only the events on July 22. Although it is clear that the fetal monitoring strips demonstrate the well-being of the twins, their well-being is not at issue until July 22. For this reason, the trial court's denial of the negative inference instruction is not a ground for reversal.

### 4. TWINS' LIVING EXPENSES

Finally, the appellants argue that the trial court erred in instructing the jury with T.P.I. 3-Civil 14.30 to deduct the twins' living expenses had the twins lived from any damages awarded. The argument is based on the fact that there was no proof of the projected living expenses. The same argument was made in *Wallace v. Couch*, 642 S.W.2d 141 (Tenn. 1982), the case that established the rule that living expenses should be taken into account in arriving at the pecuniary value of the decedent's life. The court refused to reverse the jury verdict despite the lack of evidence of living expenses in the record. The court recognized that in general the jury must act only upon what is presented to them at the trial, but held that in exceptional circumstances the jury could draw upon its own experience and knowledge.

We do not wish to minimize the obligation to establish facts with competent proof, but in the circumstances of this case, we do not think the court erred in charging the jury on the rule laid down in *Wallace v. Couch*.

### V.
### DISCRETIONARY COSTS

The trial court awarded Dr. Caldwell $7,878.00 and the Hospital $8,444.00 in discretionary costs. Tennessee Rules of Civil Procedure provide for a trial court to award "reasonable and necessary court reporter expenses for depositions or trials [and] reasonable and necessary expert

witness fees for depositions or trials . . . ." Tenn. R. Civ. P. 54.04(2). The awarding of discretionary costs is in the trial court's discretion, and the trial court's decision will not be overturned absent an abuse of discretion. *Oster, Div. of Sunbeam Corp. v. Yates*, 845 S.W.2d 215, 217-18 (Tenn. 1992); *Lock v. National Union Fire Ins. Co. of Pittsburgh, Pa*, 809 S.W.2d 483, 490 (Tenn. 1991).

We find no abuse of discretion in the trial court's decision. Both appellees filed post-trial motions with accompanying affidavits outlining the costs they sought. Dr. Caldwell asked for a total of $11,681.31, and the Hospital asked for a total of $12,549.96. The trial court awarded less than the requested amounts.

Therefore, this issue is without merit.

We reverse in part and affirm in part the proceedings in the trial court. Tax the costs on appeal to the appellants, Julie Amanda Durbin and James M. Durbin.

_____
BEN H. CANTRELL, PRESIDING JUDGE, M.S.